**SUZUKI OF WESTERN MASS, INC., d/b/a Allpower, Plaintiff,**

v.

**OUTDOOR SPORTS EXPO, INC. and Suburban Marine, Defendants.**

**No. CIV.A. 97–30229–MAP.**

United States District Court,
D. Massachusetts.

Jan. 10, 2001.

John J. Pribish, Friedman–Siegelbaum, Roseland, NJ, George F. Kelly, George F. Kelly, Springfield, MA, for Suzuki of Western Mass., Inc. dba Allpower, Plaintiffs.

Henry L. Rigali, Springfield, MA, Kerry David Strayer, Kamberg, Berman, P.C., Springfield, MA, for Outdoor Sports Expo Group, Inc.

Mark A. Gelinas, Richard D. Gelinas, Gelinas & Gelinas, Chicopee, MA, for Frank Sousa.

Peter Q. Montori, Nicolai Law Group, P.C., Springfield, MA, for Action Marine and Sports Center Corp.

Kerry David Strayer, Kamberg, Berman, Springfield, MA, for Suburban Marine.

*MEMORANDUM REGARDING OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

(Docket No. 50)

PONSOR, District Judge.

## I. INTRODUCTION

In this action, plaintiff seeks damages for violations of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1, and its state analogue, Mass. Gen. Laws ch. 93,

§ 4, as well as for violations of Mass. Gen. Laws ch. 93A, §§ 2 and 11.

Defendants' joint motion for summary judgment was referred to Magistrate Judge Kenneth P. Neiman. On February 24, 2000, he recommended allowing summary judgment as to all claims except those based on activities occurring in the fall of 1993 and winter of 1994. For the reasons set forth below, the court will adopt the unobjected-to portions of the Report and Recommendation recommending partial allowance of defendants' motion for summary judgment, but will decline to adopt the portion recommending denial of the motion as to the limited segment of plaintiff's claims. The upshot of the court's action will be that the defendants' motion will be allowed *in toto;* judgment will enter for defendants on all counts. The reason for the court's ruling is that, even viewed in the light most favorable to plaintiff, the facts of the record could not possibly support a finding that *any* antitrust violation occurred, at any time.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" issue is one that reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At the summary judgment stage, the trial court must review respondent's evidence and draw all justifiable inferences in respondent's favor. *See Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, respondent (here plaintiff) "may not rest upon the mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotations and citations omitted).

## III. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. *Factual Background*

Plaintiff, Suzuki of Western Mass, Inc, d/b/a Allpower ("Allpower") is a retail boat dealer located in Granby, Massachusetts. Allpower is owned and operated by Daniel D'Arcy. Defendant Outdoor Sports Exposition Group ("OSEG") produces sportsmen's shows, boat shows, and trade and consumer expositions in western Massachusetts and northern Connecticut. OSEG is a closely held, family business operated by Frank Sousa ("Sousa") in Chicopee, Massachusetts. Defendant Suburban Marine ("Suburban") is a retail boat dealer owned by Wes Hatch and located in Meriden, Connecticut.

Each year, OSEG promotes and produces "Boating U.S.A.," a boat show at the Eastern States Exposition Center in West Springfield, Massachusetts ("Boat Show"). OSEG rents space at the Eastern States Exposition Center and invites retail boat dealers to exhibit boats to the general public. OSEG charges each retail boat dealer a fee to participate in the show and charges an admission price to the general public.

There are a limited number of boating manufacturers in the United States. Each of these manufacturers produces a number of "lines" of boats. These boat lines carry the common brand names associated with boats, such as Wellfleet, Maxum, and Bayliner. Each boat line can include up to thirty or forty models. Retail boat dealers contract with manufacturers to display and

sell the models in a particular boat line. For example, a retail boat dealer would contract with U.S. Marine, a manufacturer, to sell models of the Maxum boat line.

OSEG's Boat Show provided boat dealers an opportunity to display their boat lines and gave potential consumers an opportunity to view and compare different boats. OSEG's "terms, rules, and regulations" for the 1994 Boat Show stated OSEG's intention "to give the public a one-stop marine showplace where the widest range of boat lines and marine products will be on display for viewing and sale." Affidavit of Frank Sousa, Docket No. 54, Exh. G ("Sousa Aff."). In furtherance of this goal, OSEG allowed only one dealer to show a particular line of boats and required the dealer to show a maximum of four models of each line displayed. *Id.*

OSEG adopted a set of rules in 1990 to determine which dealer would exhibit a particular boat line. OSEG later incorporated a version of those rules into its form contract for the 1994 Boat Show. OSEG required each dealer to sign the form contract in order to be considered as an exhibitor for the 1994 Show. *See* Sousa Aff., Exh. G. According to the rules, OSEG gave "highest consideration" to the dealer that had exhibited a particular line in the 1993 show. *Id.* For example, the dealer who exhibited Wellfleet boats at the 1993 show would be given priority to exhibit those boats at the 1994 show. OSEG's policy of allowing only one dealer to exhibit a boat line and the criteria adopted for selecting that dealer have been referred to by both parties as the "priority dealer rule."

OSEG made one exception to its priority dealer rule. If space became available, OSEG reserved "the right to offer that space to a dealer with a line of boats already in the show." Sousa Aff., Exh. G. OSEG would make this exception only if the new dealer and the existing dealer "agree[d] in writing to show the same boat line but different models and sizes." *Id.*

In December 1993, plaintiff notified OSEG that it intended to display "boats manufactured by the same companies as last years [sic] contract with [OSEG]" at the 1994 Boat Show. Sousa Aff., Docket No. 54, Exh. M. Plaintiff further stated, "[w]e expect nobody else to be displaying boats by the above-mentioned companies as we displayed them in 1993 as per your approved contract and expect to have priority in 1994." *Id.*

In addition to the lines it had displayed in 1993, plaintiff also wanted to show boats from the Maxum boat line. *See* Complaint, Docket No. 1 at ¶ 38. Suburban Marine, however, had shown the Maxum boat line in 1993 and had priority to show that line in 1994. As a result, OSEG informed plaintiff that it needed Suburban Marine's permission to show any boats from the Maxum line. *See Id.* at ¶ 39. Suburban Marine refused to agree to plaintiff's request to show boats from the Maxum line in the 1994 show.

Plaintiff alleges that, after it had requested to show the Maxum line, OSEG and Suburban conferred and decided to deny plaintiff's request, creating pretextual reasons for their decision. Specifically, plaintiff states that it had a "number of conversations" with Suburban Marine and OSEG between 1988 and 1994. Plaintiff's Opposition To Defendants' Motion For Summary Judgment And Motion For Leave To Conduct Further Discovery Pursuant To Rule 56(f), Docket No. 74, Exh. 5, ¶ 3 ("Plaintiff's Opposition to Summary Judgment"). During those conversations, defendants informed plaintiff that it would not be allowed to display the Maxum line. Plaintiff asserts that in conversations with Suburban,

[w]hen the issue of . . . entering the show with Maxum boats was raised in [Suburban and OSEG's] discussions, on each occasion [Suburban] communicated [its] unwillingness to allow any competing Maxum boat dealers into the show and indicated that . . . OSEG had agreed to

honor [Suburban's] insistence on enforcing the priority dealer rule.

*Id.* OSEG and Suburban vigorously dispute the claim that they conferred in the decision to deny plaintiff's application to the boat show. They concede, however, that plaintiff was barred from showing the Maxum boats by the priority dealer rule.

### B. *Procedural Background*

On October 20, 1997, plaintiff filed suit against OSEG, OSEG's owner, Frank Sousa, Action Marine and Sports Center Corp. ("Action Marine"), Suburban Marine ("Suburban"), and other unnamed defendants. In its lengthy complaint, plaintiff alleged that defendants OSEG and Suburban illegally deprived it access to the boat show from 1988 through 1994 by refusing to allow it to exhibit the Maxum line of boats in those years. Plaintiff further alleged that OSEG and Action Marine denied it access to the 1996 Boating Show.

■ The complaint consisted of twelve counts, including: restraint of trade in violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1 and its state analogue, Mass. Gen. Laws ch. 93 § 4 (counts I, V and VI); violations of Section Two of the Sherman Antitrust Act, 15 U.S.C. § 2 and its state analogue, Mass. Gen. Laws ch. 93 § 5 (count II, III, IV, VII, VIII, and IX); violation of Mass. Gen. Laws. ch. 93A §§ 2 and 11 (count X); intentional interference with advantageous relations (count XI); and refusal to deal asserted against OSEG (count XII).[1] Defendants

promptly moved to dismiss the complaint, on the ground that the allegations failed to support a claim for antitrust violation.

On July 9, 1998, Magistrate Judge Neiman issued a Report and Recommendation to the effect that all counts against defendants Action Marine and Frank Sousa should be dismissed. The Report and Recommendation further recommended dismissal of counts II, III, IV, VII, VIII and IX, alleging violations of Section Two of the Sherman Antitrust Act and Mass. Gen. Laws ch. 93 § 5, as well as count XI, alleging intentional interference with advantageous relations against OSEG and Suburban. On February 19, 1999, this court adopted the Report and Recommendation in its entirety and issued an order dismissing all counts save those alleging violations of Section One of the Sherman Antitrust Act, Mass. Gen. Laws ch. 93 § 4, Mass. Gen. Laws ch. 93A, and refusal to deal against OSEG.

In a January 24, 1999 scheduling order this court noted "[t]he marked weakness of plaintiff's allegations ... and the substantial expense that will be required to complete discovery" and therefore took the unusual step of permitting defendants to file a motion for summary judgment before commencing discovery. Further Scheduling Order, Docket No. 47 at 2. This court advised plaintiff that it was free to oppose summary judgment both on the merits and by invocation of the Fed.R.Civ.P. 56(f) "escape hatch."[2]

---

1. It is not clear whether the "refusal to deal" under count XII asserts a statutory antitrust violation or whether plaintiff intended to assert a common law claim. To the extent that it asserts a statutory antitrust claim, it will be subsumed in the analysis of plaintiff's Sherman Act claims. To the extent that the count asserts a common law claim, if any such common law claim existed, it has been effectively replaced by the Massachusetts antitrust statutes. *See Boos v. Abbott Laboratories,* 925 F.Supp. 49, 54 (D.Mass., 1996) ("the [Massachusetts] legislature intended, by its passage of comprehensive antitrust legislation, to replace the common law regime and to specify fully, by statute, the remedies available for

acts which would have violated the common law").

2. Rule 56(f) states as follows:

Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such order as is just.

Fed.R.Civ.P. Rule 56(f). Rule 56(f) "comprises a procedural escape hatch for a party who

Defendants jointly filed a motion for summary judgment, memorandum of law and supporting affidavits on July 2, 1999. Plaintiff did not formally oppose the motion, but instead filed a motion for Rule 56(f) relief, along with supporting affidavits. On October 8, 1999, Magistrate Judge Neiman noted that plaintiff's Rule 56(f) motion "failed to track defendants' motion for summary judgment in any meaningful way" and therefore ordered plaintiff to file a formal opposition.

On November 29, 1999, plaintiff filed a renewed motion for Rule 56(f) relief and a separate memorandum of law opposing defendants' motion for summary judgment. On February 24, 2000, Magistrate Judge Neiman issued a Report and Recommendation to the effect that plaintiff's renewed motion for Rule 56(f) relief should be denied completely and defendants' summary judgment motion should be denied, in part. The Report and Recommendation recommended that plaintiff's remaining claims against OSEG and Suburban be limited to events surrounding the 1994 Boat Show only, and that all other claims be dismissed. Significantly, plaintiff filed no objection to this recommendation.

Before this court are OSEG and Suburban's partial objections to the February 24, 2000, Report and Recommendation. Specifically, defendants assert that, as a matter of law, they did not violate Section One of the Sherman Antitrust Act or its state analogue by refusing to allow plaintiff to exhibit Maxum boats at the 1994 Boat Show. The rather complex procedural history has whittled this case down to a single question: Could any factfinder reasonably conclude that OSEG and Suburban conspired to unreasonably restrain trade in violation of the antitrust laws by agreeing to prohibit plaintiff from showing the Maxum line of boats in the 1994 Boat Show?

The answer is no. The undisputed facts of record—indeed, even the facts averred by plaintiff—conclusively show that defendants violated no federal or state laws. The antitrust claims fail because the priority dealer rule was unilaterally adopted by OSEG, and, therefore, was not the product of a conspiracy in restraint of trade. In addition, the undisputed evidence clearly indicates that OSEG had no motive to enter into a conspiracy and that the complained-of activity did not harm competition. The state law claims under Mass. Gen. Laws. ch. 93A fail because they rest entirely upon plaintiff's federal and state antitrust claims.

For the above reasons, any further discovery under Fed.R.Civ.P. 56(f) would be futile; no evidence generating a disputed issue of fact could be obtained.

## IV. *DISCUSSION*

### A. *Plaintiff's Antitrust Claims*

1. *Burden On Summary Judgment Under Section One Of The Sherman Antitrust Act*

 Section One of the Sherman Antitrust Act renders illegal:

[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations . . .

15 U.S.C. § 1 ("Section One"). In order to prevail on a Section One claim, plaintiff must prove two distinct components. Plaintiff must first prove that the complained-of activity was the product of an agreement between at least two parties, as opposed to unilateral activity. Second, plaintiff must show that the agreement unreasonably restrained trade. Plaintiff has not satisfied either component; the record indicates, first, that the priority

genuinely requires additional time to marshal facts essential to justify its opposition when confronted by a summary judgment motion." *Paterson–Leitch Co., Inc. v. Massachusetts*

*Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir.1988) (citation and internal quotation marks omitted).

dealer rule was established unilaterally by OSEG and, second, that even if OSEG and Suburban had agreed, that agreement did not unreasonably restrain trade.[3]

2. *OSEG Unilaterally Adopted The Priority Dealer Rule*

■ Plaintiff concedes that OSEG unilaterally adopted its priority dealer rule.[4] This concession is fatal to its Section One claim. It is well settled that

the [Sherman Antitrust] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

*U.S. v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *accord Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) ("[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently"); *U.S. v. Parke, Davis & Co.*, 362 U.S. 29, 36, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) ("under the *Colgate* doctrine a manufacturer, having announced a . . . policy, may bring about adherence to it by refusing to deal with customers who do not observe that policy"). As plaintiff admits, OSEG determined, on its own, the terms it would apply in selecting exhibitors and announced those terms in advance of receiving applications from dealers. Such "[u]nilateral action, no matter what its motivation, cannot violate [Section One]." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110 (3d Cir.1980).[5]

Excluding unilateral activity from Section One scrutiny makes sense considering Section One's expansive language. Section One proscribes "every contract, combination . . . or conspiracy" that restrains trade. 15 U.S.C. § 1. Courts, however, have long recognized that not all agreements fall within Section One's ambit. Indeed, "read literally, § 1 would outlaw the entire body of contract law." *Associated*

---

3. Section One of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section four of the Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93 § 4, are comparable statutes; each prohibits combinations or conspiracies that unreasonably restrain trade. The Massachusetts Antitrust Act provides that it "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes as far as practicable." M.G.L. c. 93 § 1. As a result, determining the merits of plaintiff's Sherman Act claims will also determine the merits of plaintiff's claims under M.G.L. c. 93 § 4. *See Winter Hill Frozen Foods and Services, Inc. v. Haagen–Dazs Co.*, 691 F.Supp. 539, 543 n. 5 (D.Mass.1988).

4. Plaintiff's memorandum states as follows:
"That the OSEG rules were unilaterally established does not end the inquiry. The rules restrict access and space at the Boating USA show to one (1) exhibitor of each particular boat line. All applicants for the boat show agree to be bound by the rules of OSEG. Thus, the rules are meaningless without the applicants and exhibitors who agree to be bound by them. The OSEG rules, while unilaterally established, were the vehicle by which the defendants could,

and did, exclude entry to the shows by intrabrand competitors."
Plaintiff's Opposition to Summary Judgment, Docket No. 74 at 11.

5. Plaintiff attempts to sidestep the difficulty presented by *Colgate* and its progeny by asserting that OSEG and Suburban had subsequent conversations in which they discussed whether Suburban would allow plaintiff to exhibit the Maxum line. The fact that OSEG and Suburban talked, however, does not change the unilateral terms into the product of a conspiracy. Plaintiff never alleges that OSEG and Suburban reached a new, or illicit, agreement. Plaintiff merely asserts that they discussed the terms unilaterally adopted by OSEG. Plaintiff's Opposition to Summary Judgment, Docket No. 74, Exh. 5, ¶ 3. Such conversations do not raise antitrust concerns. *See, Monsanto*, 465 U.S. at 765, 104 S.Ct. 1464 (1984) ("to permit the inference of concerted action on the basis of receiving complaints [from a competitor] alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the [antitrust] statute") (internal quotations and citations omitted).

General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 531, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

To further narrow the breadth of Section One's language, the Supreme Court has held that an agreement in violation of Section One occurs when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." American Tobacco Co. v. U.S., 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Cf. Monsanto 465 U.S. at 765, 104 S.Ct. 1464 (for Section One conspiracy, plaintiff must show that defendants had a "conscious commitment to a common scheme designed to achieve an unlawful objective") (internal quotations omitted). A restraint of trade cannot simply be a corollary of the agreement; the restraint must be an objective of the agreement. Where one party adopts the terms of the agreement on its own and then sells according to those terms, the unilateral terms are not the objective of the resultant sales agreement; the sale is. The unilateral terms are merely the conditions imposed by one party necessary for it to complete the deal.

Here, OSEG agreed to sell Suburban exhibit space at the 1994 Boat Show; the two did not agree to a set of terms that would exclude plaintiff. Those terms were unilaterally adopted by OSEG four years earlier. The terms were announced to prospective applicants before they applied for admission to the 1994 show. In addition, it is undisputed that OSEG's selection of Suburban as the exhibitor of the Maxum line was consistent with the terms set forth. OSEG alone adopted the priority dealer rule and OSEG alone carried it out. Put simply, "when the only act specified in the [complaint] amounted to saying that the trader had exercised his right to determine those with whom he would deal, and to announce the circumstances under which he would refuse to sell, no Sherman Act violation [is] made out." Parke, Davis & Co., 362 U.S. at 42, 80 S.Ct. 503.[6]

3. OSEG Had No Motive To Enter Into A Conspiracy

The fact that OSEG unilaterally adopted the priority dealer rule indicates that OSEG's "failure to deal [with plaintiff] was the product of factors other than conspiracy." First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). This indication is buttressed by the fact that OSEG had no motive to join Suburban in a conspiracy to exclude plaintiff. As the Supreme Court has asserted:

The absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: "if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."

Matsushita, 475 U.S. at 597, 106 S.Ct. 1348; accord Cities Service, 391 U.S. at 278–279, 88 S.Ct. 1575 (where only evidence indicating conspiracy was defendant's refusal to deal with plaintiff, defendant's motive becomes essential element of litigation).

As plaintiff asserts, the fruits of a conspiracy to exclude plaintiff from the 1994

**6.** Plaintiff attempts to preserve its claim by asserting that, though unilaterally adopted, OSEG's priority dealer rule resulted in a restraint of trade. Yet, it is well settled that "[e]ven where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of an agreement" as contemplated by the antitrust act. Fisher v. City of Berkeley, Cal., 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). In other words, even if plaintiff were hurt by OSEG's priority dealer rule, that hurt does not rise to the level of an antitrust claim.

Boat Show—control of the market in Maxum boats with the power to sell at higher prices—could only be reaped by a retailer such as Suburban. OSEG does not sell boats, much less Maxum boats. OSEG's profits derive from ticket sales to the public and the sale of exhibit space to the respective dealers. OSEG's profits were in no way tied to the price at which Suburban sold its boats.

OSEG did have competing incentives in operating the boat show. Those incentives included maximizing the number of exhibitors, while, at the same time, ensuring the widest variety of boats for the viewing public. OSEG's priority dealer rule represents a reasonable attempt to strike a balance between these incentives. *See Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 528 (1st Cir.1989) ("a supplier may sometimes prefer to have only one dealer, perhaps because he thinks that is the best way to promote his product").

As OSEG's terms and conditions made clear, it sought "to give the public a one-stop marine showplace where the widest range of boat lines and marine products will be on display for viewing and sale." Sousa Aff., Docket No. 54, Exh. G. Maximizing the kind and variety of boat lines displayed, and avoiding duplication, made the show more attractive to the public, which in turn generated more ticket sales. Even OSEG's exception to its single dealer rule dovetailed with its desire to insure variety; two dealers could only show the same line if they agreed in writing to show *different* models of that line.

If anything, it is "much more plausible to believe that [OSEG's and plaintiff's] interests coincided, rather than conflicted." *Cities Service Co.*, 391 U.S. at 285, 88 S.Ct. 1575. OSEG sought the greatest number of dealers displaying the widest variety of boats. Plaintiff, in turn, sought exhibit space at the boat show to display the products it sold. In fact, the course of dealing between OSEG and plaintiff "give ample evidence of ... this similarity of interest." *Id.* It appears from the record that plaintiff went through the application process for the 1994 Boat Show and did exhibit several different boat lines. The mere fact that it was not allowed to show the Maxum line as well only suggests that its economic interests were not in *complete* agreement with OSEG's priority dealer rule.

Since OSEG unilaterally adopted its priority dealer rule and the evidence indicates that OSEG had no plausible motive for entering into a conspiracy with Suburban, plaintiff has failed to make out a violation of Section One of the Sherman Act.

### 4. *Harm To Competition*

 As noted, OSEG and Suburban did not reach an agreement actionable under the Sherman Act. That finding alone disposes of plaintiff's antitrust claims. Assuming, *arguendo*, that OSEG and Suburban agreed in a manner contemplated by the Sherman Act, plaintiff has not, and could not, demonstrate that the agreement unreasonably restrained trade.

Virtually all business agreements restrain trade. Section One, therefore, has been construed to "prohibit[ ] only agreements that *unreasonably* restrain trade." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (emphasis in original). To determine the reasonableness of a restraint, courts most often employ a rule of reason analysis that focuses the inquiry on "whether [the] restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3rd Cir.1996); *quoting Board of Trade of City of Chicago v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

In some circumstances, courts will find that a restraint results in a *per se* violation of Section One. The *per se* finding is reserved for "categories of conduct for which

no exculpatory justification will be entertained by a court." *M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 977 (1st Cir.1984). With such *per se* violations, "proof of the defendant's power, of illicit purpose and of anticompetitive effect are all said to be irrelevant" and the mere fact of the agreement indicates an antitrust violation. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993).

■ A *per se* finding could never be made here. Plaintiff alleges, in essence, that the agreement to exclude it from the 1994 Boat Show constituted a concerted refusal to deal. Concerted refusals to deal do not amount to *per se* violations unless they involve "horizontal agreements among direct competitors." *NYNEX Corp.*, 525 U.S. at 135, 119 S.Ct. 493.[7]

OSEG and Suburban are not direct competitors; OSEG (the supplier of exhibit space) and Suburban (a purchaser of exhibit space) are on different levels of the market structure. As a result, any agreement they made would properly be considered vertical, not horizontal.

The Supreme Court has provided a number of guides for determining the propriety of a vertical restraint stemming from a refusal to deal. First, a plaintiff alleging that a vertical restraint violated Section One "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp.*, 525 U.S. at 135, 119 S.Ct. 493; *accord Interface Group, Inc. v. Massachusetts Port Authority*, 816 F.2d 9, 10 (1987) ("anticompetitive" in the context of the Sherman Act, "refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process"). Second, the Supreme Court has repeatedly confirmed that "the primary purpose of the antitrust laws" is to protect interbrand competition, as opposed to intrabrand competition. *State Oil Co. v. Khan*, 522 U.S. 3, 15, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (same).[8]

---

7. The First Circuit has distinguished between vertical and horizontal agreements as follows:

> It is important to distinguish between "horizontal" restraints, i.e., agreements between competitors at the same level of market structure, and "vertical" restraints, i.e., combinations of persons at different levels of the market structure such as manufacturers and distributors.... Horizontal restraints alone have been characterized as "naked restraints of trade with no purpose except stifling competition," ... and, therefore, per se violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products.... They are, therefore, to be examined under a rule of reason standard.

*M&H Tire Co.*, 733 F.3d at 978.

8. In *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) the Supreme Court explained the difference between interbrand and intrabrand competition in the context of television manufacturing:

> Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.
>
> The degree of intrabrand competition is wholly independent of the level of interbrand competition confronting the manufacturer. Thus, there may be fierce intrabrand competition among the distributors of a product produced by a monopolist and no intrabrand competition among the distributors of a product produced by a firm in a highly competitive industry. But when interbrand competition exists, as it does among television manufacturers, it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product.

*Id.* at 52 n. 19, 97 S.Ct. 2549.

Given these foci, the record indicates that any agreement between OSEG and Suburban could not have harmed competition. Plaintiff claims that the agreement stifled intrabrand competition, hurting the competitive process by creating an incentive for Suburban and other dealers to charge inflated prices.

Although it is true that OSEG's priority dealer rule limited intrabrand competition, this limitation did not hurt the competitive process. It is undisputed that OSEG's rules preserved interbrand competition. As a result, Suburban did not simply compete with other Maxum dealers for customers, but also with dealers of other brands presented at the boat show. Nothing kept a potential customer from purchasing a Sea Ray or Marina boat if Suburban priced its Maxum line too high. Regardless of whether plaintiff exhibited Maxum boats at the show, Suburban would still have to maintain competitive prices. "[W]hen interbrand competition exists ... it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute different brands of the same product." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 53 L.Ed.2d 568.

In fact, OSEG's priority dealer rule may have provided a benefit to competition rather than a harm. OSEG's policy allowed for the maximum variety of boat lines to be displayed to consumers. This meant that the boat dealers were not just competing over prices; instead, the boat dealers would be competing as to which line had the best quality and kind of boat. In this way, not only would price factor into the competitive equation, but also size, reliability, durability and other components that have directly to do with the quality of the products sold. In this context, the lack of intrabrand competition is innocuous. Indeed, "any negative effect of exploitation of the intrabrand market ... would be checked by competition in the interbrand market ... because consumers would substitute a different brand of the same product." *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 471, n. 17, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

In short, a policy that stimulates interbrand competition, "the primary concern of the antitrust laws," *Business Electronics Corp.,* 485 U.S. at 726, 108 S.Ct. 1515, does not amount to a harm to competition or to the competitive process. Without such a harm, OSEG and Suburban's alleged agreement did not violate Section One of the Sherman Act.

B. *Plaintiff's 93A §§ 2 and 11 Claims*

Finally, plaintiff's chapter 93A claims must be dismissed as well. *See Egan v. Athol Memorial Hosp.,* 971 F.Supp. 37, 47 (D.Mass.1997) (upon dismissal of state and federal antitrust claims, chapter 93A claims offering no independent evidence asserting unfair or deceptive trade practices must be dismissed as well). A chapter 93A claim must demonstrate that "the defendant's actions fell within at least the penumbra of some common-law, statutory, or other established concept of unfairness, or were immoral, unethical, oppressive or unscrupulous." *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1484 (1st Cir.1996); *quoting Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510, 1513 (1st Cir.1989). In *Quaker State,* the First Circuit held that "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." 884 F.2d at 1513 (internal citations and quotations omitted).

Here, the chapter 93A claim cannot fall within the penumbra of plaintiff's statutory claims since those claims have been dismissed. In addition, plaintiff makes no unique arguments related to his Chapter 93A claim and has offered no evidence sufficient to show defendants committed unfair or deceptive acts warranting recovery under Mass. Gen. Laws ch. 93A. As a result, plaintiff's 93A claims perish along with their antitrust hosts.

## V. *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is allowed in its entirety. In accordance with this ruling and the court's previous rulings, the clerk is ordered to enter final judgment for defendants on all of plaintiff's claims.

A separate order will issue.