# United States Court of Appeals
# For the First Circuit

No. 04-1045

RAFAEL ARROYO-MELECIO; DANIEL ESPINOSA-DE-LEÓN; ANGEL M.
ORTIZ-QUIÑONES; CELIA RODRÍGUEZ-RIVERA; CONJUGAL PARTNERSHIP
ORTIZ-RODRÍGUEZ,

Plaintiffs, Appellants,

v.

PUERTO RICAN AMERICAN INSURANCE COMPANY; UNIVERSAL INSURANCE
COMPANY; PREFERRED RISK INSURANCE COMPANY; INTEGRAND ASSURANCE
COMPANY; COOPERATIVA DE SEGUROS MULTIPLES DE PUERTO RICO; ROYAL &
SUN ALLIANCE OF PUERTO RICO, INC.; SEGUROS TRIPLE SSS, INC.;
NATIONAL INSURANCE COMPANY; AMERICAN INTERNATIONAL INSURANCE
COMPANY OF PUERTO RICO, INC.; CARIBBEAN ALLIANCE INSURANCE
COMPANY; ALLSTATE INSURANCE COMPANY; ASOCIACIÓN DE SUSCRIPCÍON
CONJUNTA DE SEGURO DE RESPONSABILIDAD OBLIGATORIO,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Antonio J. Amadeo-Murga for appellants.
Heidi L. Rodríguez, with whom Néstor M. Méndez-Gómez, Kevin M.
Acevedo-Carlson, and Pietrantoni Mendez & Alvarez LLP were on
brief, for appellees Puerto Rican American Insurance Company &
Preferred Risk Insurance Company.

Arturo J. García-Solá, with whom Luz Nereida Carrero, Mario Arroyo, Fiddler González & Rodríguez, Roberto C. Quiñones-Rivera, Nannette Berríos-Haddock and McConnell Valdés were on brief, for all appellees except Puerto Rican American Insurance Company & Preferred Risk Insurance Company.

_____

February 14, 2005

_____

**LYNCH**, **Circuit Judge**.  In 1995, in order to address the problem of the large number of drivers in the Commonwealth of Puerto Rico without vehicle liability insurance, the commonwealth enacted the Compulsory Motor Vehicle Liability Insurance Act, Law 253 ("Law 253"), codified at 26 P.R. Laws Ann. §§ 8051 et seq.

This federal antitrust suit challenged certain conduct of private insurers and the new state-created entity under Law 253, the Joint Underwriting Association ("JUA"), in the compulsory insurance program.  The suit was dismissed at the pleadings stage under Fed. R. Civ. P. 12(b)(6).  The plaintiffs, who purport to represent a class of harmed consumers, appeal.

In sum, the plaintiffs allege that the defendants, private insurers and the JUA, have agreed to and created a monopoly in the JUA as to all forms of low-cost compulsory insurance and have boycotted and coerced at least one broker in order to maintain that monopoly.  The private insurers and the JUA argue that this monopoly is a result required by the state law.  That is untrue. The Puerto Rico statute contemplates (at least as to non-high-risk policies) competition, but then, oddly, creates incentives for defendants to create just such a monopoly as alleged.  The claims before us are a different matter: a federal antitrust suit raises different issues than issues of compliance with local statutes.  As to one claim only, we reverse the dismissal and remand; we affirm the dismissal of all other claims.

-3-

**I.**

We describe the statutory scheme. Before the enactment of Law 253, uninsured drivers caused over $110 million in damages to other vehicles each year in Puerto Rico, and it was estimated that only 25 percent to 30 percent of the vehicles in Puerto Rico were covered under some type of liability insurance.

Law 253 created a compulsory automobile liability insurance system, which, beginning in 1998, provides each insured vehicle owner with $3000 of coverage for damages caused to third parties per accident in exchange for a uniform premium, initially set at $99 for each private passenger vehicle and $148 for each commercial vehicle. 26 P.R. Laws Ann. §§ 8052(j), 8056(a). All "private insurers," defined as insurers with more than 1 percent of the commonwealth's total volume of vehicle liability premiums, id. § 8052(b), are required to offer the compulsory liability insurance in two ways: both as private insurers to a defined class of drivers and as members of the JUA, to which they must belong. Id. §§ 8053(d), 8054(a), 8055(a). Law 253 allows private insurers to reject certain applicants for the compulsory insurance pursuant to regulations promulgated by the Insurance Commissioner. Id. § 8054(b). The criteria for rejection are defined by the Insurance Commissioner's Puerto Rican Insurance Rule LXX ("Rule LXX"), promulgated in Regulation No. 6254 in December of 2000. Most of the criteria in Rule LXX for permissible rejections identify

-4-

applicants who are bad drivers or otherwise of high risk.[1]  See Rule LXX, Art. 8.

The JUA itself provides compulsory liability insurance to all drivers,[2] including those high-risk drivers whom private insurers are not required to insure.  26 P.R. Laws Ann. § 8055(b). Vehicle owners may opt out of the compulsory liability insurance scheme by purchasing traditional liability insurance with comparable or better coverage.  See id. § 8061; Rule LXX, Art.

---

[1]Rule LXX allows private insurers to reject applicants when (1) the motor vehicle is used as a public vehicle; (2) the motor vehicle is a racing vehicle or super rapid; (3) the owner or main driver of the motor vehicle has accumulated five or more points for violations of the Vehicle and Traffic Act of Puerto Rico, during the three years prior to the date of the application for the compulsory liability insurance; (4) the owner or main driver of the motor vehicle has been convicted of driving a motor vehicle under the influence of alcohol or drugs, or of participating in any type of drag racing or races on public roads; (5) the license of the owner or main driver of the vehicle has been revoked or suspended during the year prior to the effective date when the compulsory liability insurance is requested; (6) the motor vehicle is not insurable according to the private insurer's written criteria for underwriting traditional insurance policies; (7) the owner of the vehicle has not requested the insurance; and (8) the application form as adopted by the Insurance Commissioner was not properly filled out.  Rule LXX, Art. 8.

[2]A vehicle owner must pay the premium for the compulsory liability insurance to the Secretary of the Treasury at the time he acquires or renews the vehicle's license.  26 P.R. Laws Ann. §§ 8051, 8053(a).  The Secretary then turns over the total amount of the premiums so received to the JUA, which is then responsible for distributing the premiums among its members and itself, as the case may be.  Id. § 8055(c); Rule LXX, Art. 19.  In fact, under Rule LXX, every vehicle for which the requisite compulsory liability insurance premium has been paid is considered to be insured by the JUA unless the owner of the vehicle opts out by selecting a private insurer or purchasing a traditional insurance policy.  Rule LXX, Art. 12(a).

12(a). Law 253 appears to require the private insurers also to offer the policy despite the availability of coverage from the JUA, see 26 P.R. Laws Ann. §§ 8054(a), 8055(b), and allows private insurers to apply for approval to sell the compulsory insurance at less than the rate set by the commonwealth. See id. § 8056(c) ("Any private insurer may submit for the approval of the [Insurance] Commissioner a variation of a uniform percentage to reduce the uniform compulsory liability insurance premium . . . ."). Some legislative history suggests that Law 253 was meant to encourage competition "between insurance companies wanting to have a greater number of insured, who will have to extend offers in order to attract them." Certified translation of the Daily Sessions Record, Senate of Puerto Rico, Monday, October 9, 1995. As a result, the statutory scheme contemplates competition in compulsory insurance, at least for non-high-risk drivers, between private insurers themselves and between them and the JUA. It also contemplates, but does not mandate, the possibility of a monopoly in the JUA as to compulsory insurance for high-risk drivers.

All members of the JUA share in its profits and losses. 26 P.R. Laws Ann. § 8055(e). To compensate for the fact that the JUA must insure drivers considered too risky by private insurers, all the JUA's profits, including those distributed to private insurers, are exempt from income taxes. Id. § 8055(j). Through the JUA, the risk of insuring these high-risk drivers is thus

spread among all the private insurers. The profits distributed to the JUA members (the private insurers) also encompass the profits from the sale of non-high-risk policies insured by the JUA.

Though created by law, the JUA is "private in nature, for profit, and . . . subject to the provisions of the [Insurance] Code applicable to insurers." Rule LXX, Art. 2(c). The JUA is under some direction by the commonwealth. The Insurance Commissioner is directed to establish the manner of distribution of the total amount of premiums received by the JUA, 26 P.R. Laws Ann. § 8055(c); Rule LXX, Art. 20(e)(3), and the structure and operation of the JUA, and its direction by a board of directors, so that the JUA may accomplish its goals in a "cost-effective, fair and nondiscriminatory" manner. 26 P.R. Laws Ann. § 8055(f). The plan of operations may be amended only with the approval of the Insurance Commissioner. Rule LXX, Art. 20(c)(1)(xv).

On the other hand, the Insurance Commissioner is not made a member of the board of directors of the JUA, id., Art. 20(c)(1)(iii), and does not appear to have active supervision over the day-to-day affairs of the JUA. Four of the five directors on the JUA's board of directors are elected by the members of the JUA, while the fifth director is the officer in charge of the JUA. Id. None of these directors are defined as a state official. The JUA is not an agency of the commonwealth. It has "general corporate powers," such as the power to sue and be sued, to enter into

contracts, to hold and use property, etc.  <u>See</u> Rule LXX, Art. 20(a); 26 P.R. Laws Ann. § 2905.

For both private insurers and the JUA, the commonwealth, through the Insurance Commissioner, sets the terms of the compulsory policy itself, the premium rate, and the amount of coverage.  The Puerto Rico Mandatory Liability Insurance Uniform Policy, the policy defining the terms of the compulsory liability insurance, is set forth in the Insurance Commissioner's rules. Rule LXX, Art. 22.  This policy is "the sole contract between [the insured] and [the JUA]."  The policy does not contain any specification for the type of repair parts that may be used or provisions governing repair practices.

The Insurance Commissioner has established, through regulation, a uniform initial liability determination system to facilitate the investigation, adjustment, and resolution of claims arising under the compulsory liability insurance scheme.  <u>See</u> P.R. Laws Ann. § 8057; Puerto Rico Insurance Rule LXXI ("Rule LXXI"). Rule LXXI sets out portions of the claims making process, including the use of diagrams, which are made part of the regulation, to allocate fault for accidents.  Rule LXXI, Arts. 2, 6, 7.  However, there is nothing in Rule LXXI concerning the insurers' auto repair arrangements or practices; nor does the Rule govern all claims practices.

A few points bear emphasis. First, the statute, apparently unusually,[3] contemplates competition with respect to at least the non-high-risk drivers between the private insurers and also between the private insurers and the JUA. Second, the statute provides a means for insurers who are in competition to seek to sell the compulsory insurance at a lower price than the "uniform premium." 26 P.R. Laws Ann. § 8056(c). Third, the supervision over the JUA does not cover at least some of the complained-of activities. For example, the Insurance Commissioner, by statute, has considerable supervision over the operating plan and the method of premium distribution, id. §§ 8055, 8056; by contrast, there appears to be little supervision of the JUA's specific business decisions (such as how it minimizes its costs in repairs and claims adjustment).

## II.

The plaintiff motor vehicle owners, as consumers of the compulsory insurance, brought a putative class action against

---

[3]Our own survey found no other comparable compulsory insurance scheme which contemplates competition of like kind. Cf., e.g., Ala. Code § 32-7-35 (granting Commissioner of Insurance authority to set up assigned risk plans to apportion drivers who are unable to obtain insurance through the regular market "equitably" among all insurers); Alaska Stat. § 28.20.580 (same); Fla. Stat. Ann. § 627.351(1) (same); Ga. Code Ann § 40-9-100 (same); see also Ga. Comp. R. & Regs. r. 120-2-14-.09 (insureds in assigned risk plan are assigned to insurers); Weaver v. Champion Ins. Co., 567 So.2d 380, 382 (Ala. Civ. App. 1990) (assignment of insureds to insurers in assigned risk plan is semi-random).

eleven private insurers and the JUA, alleging that the defendants violated the Sherman Act, 15 U.S.C. § 1 et seq., the Clayton Act, 15 U.S.C. § 12 et seq., and also Puerto Rico antitrust laws.[4] The plaintiffs allege that the private companies, qua companies, have agreed not to sell the compulsory insurance; this, in turn, forces customers to buy from the JUA and puts the JUA in a monopoly position. The plaintiffs allege that the insurance companies choose not to compete with the JUA at least in part because of the tax benefits that non-competition creates. The JUA is tax-exempt; its monopoly over the compulsory liability insurance policies allows all the profits from the premiums, including those from non-high-risk drivers, to accrue tax free to the JUA for later distribution to the member insurance companies. Further, by dealing only through the JUA, the private insurers lower their own costs and inflate their profit by not providing paper copies of policies to insureds and by not utilizing the services of brokers. The plaintiffs allege that Puerto Rico law requires both that policies be provided and that brokers be used. 26 P.R. Laws Ann. §§ 329, 1123. The plaintiffs admit that policies are available both online and at licensing offices. But they argue that these omissions in services reduce the services provided to the insureds. The omissions also, it may be inferred, harm consumers in another way. The plaintiffs allege that the defendants save $4.00 per

---

[4]The text of the relevant allegations are reproduced in the Appendix.

policy from not having to issue a paper copy of the policy and about 8 percent of the premium per policy for not having to pay a broker's commission. These savings are not passed on to the consumers as they would likely be if the companies in fact competed with each other and with the JUA. Indeed, Law 253 contemplated exactly such a benefit from competition to consumers when it provided that private companies could apply to sell such policies at lower rates. See 26 P.R. Laws Ann. § 8056(c). But for the acts of the defendants in creating a monopoly, the plaintiffs allege that the premiums for compulsory liability insurance could have been fixed to be "at least 12% less than the one established." The plaintiffs do not challenge the rate set by the legislature.

In addition to these horizontal agreements not to compete, the plaintiffs also allege that the private insurers acting in concert coerced brokers to refrain from selling compulsory insurance through private companies. The plaintiffs allege that one broker, Casellas and Co. ("Casellas"), attempted to present around 40,000 applications for compulsory insurance to the defendant insurance companies in the year 2000, and the applications were all rejected. The monopoly was evidently not complete since the plaintiffs also allege that one of the defendants, Seguros Triple SSS, Inc., did issue 128 compulsory insurance policies in 2000 (and paid the broker, Casellas, a commission of only 3 percent instead of 8 percent). The plaintiffs

allege that the defendants (1) threatened clients of Casellas that they should not do business with Casellas if Casellas continued to attempt to sell compulsory insurance through the private companies and (2) told other members in the insurance community that Casellas's attempts to sell compulsory insurance through private insurers were illegal and that people who did business with Casellas would go to jail.

The plaintiffs also allege that since the JUA has a monopoly in the compulsory insurance market, the JUA is able to use burdensome claims procedures and to require the use of the cheapest car parts, or "junker parts," for repairs, thus harming the consumers. The plaintiffs argue that if the JUA did not have such a monopoly, there would be competition which would produce better options as to the quality of repair parts.

Attempting to come within the boycott/coercion exception to the insurance business exemption from federal antitrust laws contained in the McCarran-Ferguson Act, the plaintiffs' complaint alleges that the acts of the defendants -- (1) agreements among the private insurers and between them and the JUA not to compete with the JUA and (2) the threats of harm to Casellas -- constitute a boycott and coercion and have caused injuries to consumers.

Taking all inferences in the plaintiffs' favor, the complaint may be read to establish four categories of injuries, at least with respect to non-high-risk compulsory insurance, to

consumers being forced to buy through the JUA's monopoly: (1) consumers do not receive copies of written insurance policies; (2) consumers do not receive the assistance of brokers; (3) these are costs the private insurers would otherwise incur if the private insurers offered comparable compulsory coverage as the JUA; private companies thus save on those costs and could then apply to offer the compulsory policy at an approved rate which is less than the rate set by regulators for the JUA; (4) in any event, the JUA's monopoly means it can, as it does, (a) require that repairs be made only with "junker" parts which are inferior to parts which might otherwise be made available in a competitive system, (b) require consumers to go through an unfair process of adjustment of claims based on unreasonable depreciation percentages, (c) require consumers to submit to an unfair system of determining fault with diagrams.

The district court, on report and recommendation from a magistrate judge, dismissed the complaint upon Fed R. Civ. P. 12(b)(6) motions from the defendants.[5] The district court held that there was a lack of antitrust injury and that the action was precluded by the filed rate doctrine. The plaintiffs timely

---

[5]The district court granted the defendants' motions to dismiss and entered judgment dismissing "this case" with prejudice. In light of the magistrate judge's recommendation, which the district court adopted in full, that the district court decline to exercise supplemental jurisdiction over the Puerto Rico law claims, we understand the district court to have meant that only the federal antitrust law claims are dismissed with prejudice and the commonwealth law claims are dismissed without prejudice.

appealed.  The defendants present six alternate grounds on appeal for affirming the dismissal: (1) there was no antitrust injury so the plaintiffs lack standing to sue under the antitrust laws, (2) the state action immunity doctrine, (3) the filed rate doctrine, (4) the doctrine of primary jurisdiction, which purportedly requires referral to the  Puerto Rico Insurance Commissioner, (5) the McCarran-Ferguson Act exemption of the business of insurance from federal antitrust liability, and (6) the lack of involvement of substantial interstate commerce.

### III.

Orders granting motions to dismiss under Rule 12(b)(6) are subject to de novo review.  Rodi v. S. New Eng. Sch. Of Law, 389 F.3d 5, 12 (1st Cir. 2004).  A reviewing court accepts all well-pleaded allegations of the plaintiffs as true and affords all inferences in the plaintiffs' favor.  Rosenberg v. City of Everett 328 F.3d 12, 15 (1st Cir. 2003).  "The issue is whether the complaint states a claim under the Sherman Act, assuming the factual allegations to be true and indulging to a reasonable degree a plaintiff who has not yet had an opportunity to conduct discovery."  DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999).

Given the Congressional policy of deference to state law embodied in the McCarran-Ferguson Act, Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 220 (1979), we think it

appropriate to begin with that statutory defense, and then turn to the other defenses.

Under the McCarran-Ferguson Act, we consider whether the two main allegations -- (1) horizontal agreements by the private insurers not to compete and not to use broker services; and (2) the JUA's practice of not permitting repairs using original equipment manufacturers' ("OEM") parts -- are within the "business of insurance," before we turn to the boycott/coercion exception. We conclude that both allegations fall within the business of insurance.

We then turn to the boycott/coercion exception to the McCarran-Ferguson Act's business of insurance exemption. We reject plaintiffs' argument that the horizontal non-competition agreement, even if it has created a monopoly in the JUA, is a boycott. We reject the defendants' argument that coercion against a brokerage firm, at the Rule 12(b)(6) stage, does not state a claim of boycott. We also reject the defendants' argument that the boycott activities are nonetheless protected by the state immunity doctrine under Parker v. Brown, 317 U.S. 341 (1943).

Because the plaintiffs are consumers and thus usually the preferred plaintiffs in antitrust claims of this sort, we reject the argument that, as to the boycott, the pleadings can determine that the plaintiffs lack standing and have not suffered any antitrust injury. We find that the plaintiffs' boycott claim does

not implicate the filed rate doctrine or the primary jurisdiction defenses.  We also reject the defendants' contention that, as to the boycott, the substantial impact on interstate commerce requirement of the antitrust laws has not been met.

The McCarran-Ferguson Act

Under section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is . . . illegal."  15 U.S.C. § 1.  "The usual section 2 [Sherman Act] claim requires monopoly or near monopoly power in some market, and a wrongful exclusionary act designed to enhance such power in that market or to achieve an improper advantage in another market." Town of Norwood v. New Eng. Power Co., 202 F.3d 408, 420-21 (1st Cir. 2000).

The insurance industry, however, receives special treatment under the antitrust laws by virtue of the 1945 McCarran-Ferguson Act, codified at 15 U.S.C. § 1011 et seq.:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That . . . [the antitrust laws and the FTC Act] shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

-16-

15 U.S.C. § 1012(b) (emphasis in original).  Thus the McCarran-Ferguson Act exempts the "business of insurance" from review under the federal antitrust laws to the extent that it is "regulated by State law."[6]  Puerto Rico is considered to be a state for purposes of sections 1 through 3 of the Sherman Act, as amended and codified at 15 U.S.C. §§ 1-3.  See R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 489 (1st Cir. 1994); Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36, 42 (1st Cir. 1981).

The McCarran-Ferguson Act also goes on to carve out, in a separate section, an exception to the "business of insurance" exemption from antitrust liability: "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."  15 U.S.C. § 1013(b).

This appeal is largely about the interplay between § 1012(b), the basic McCarran-Ferguson Act exemption from federal antitrust liability, and § 1013(b), the "boycott, coercion, or intimidation" exception to the McCarran-Ferguson Act exemption. This court has summarized the interplay as follows, "The McCarran-Ferguson Act . . . exempts from the antitrust laws all conduct that

---

[6]In fact, the term "business of insurance" is used twice in 15 U.S.C. § 1012(b).  The first clause "commits laws 'enacted . . . for the purpose of regulating the business of insurance' to the States, while the second clause exempts only 'the business of insurance' itself from the antitrust laws." U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 504 (1993).   The scope of the first clause is not as "narrowly circumscribed" as the second. See id.

-17-

is (1) part of the 'business of insurance'; (2) 'regulated by State law'; and (3) not in the form of 'boycott, coercion, or intimidation.'"  Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I., 883 F.2d 1101, 1107 (1st Cir. 1989).[7]

---

[7]We quickly dispose of two possible objections to application of the McCarran-Ferguson exemption here.  The literal language of the McCarran-Ferguson Act exemption contained in the first sentence in § 1012(b) precludes application of federal statutes which "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance."  15 U.S.C. § 1012(b).  An argument could easily be made by the plaintiffs that their claims are entirely consistent with and not in conflict with state law and so the first proviso is not met and there is no McCarran-Ferguson exemption.  Any such argument is foreclosed by judicial construction of the McCarran-Ferguson Act.  The McCarran-Ferguson Act has generally been construed to cover arguments that the defendants failed to comply with state law, so long as the state law concerns the regulation of the business of insurance.  As the treatise by Areeda and Hovenkamp puts it, "if the state's insurance industry is 'regulated by state law,' then the antitrust laws simply do not apply, notwithstanding that the application of antitrust law in the particular case in no way 'invalidate[s], impair[s], or supersede[s]' state law and may even be consistent with it."  I Areeda and Hovenkamp, Antitrust Law, ¶ 219c, at 339 (2d ed. 2000) (alterations in original). Further, "[a]lthough state insurance regulation is not invalidated or impaired [by application of the Sherman Act], the mere presence of the regulation is sufficient to oust the federal antitrust claim." Id. at 340.

We dispose of another contention.  The final sentence of § 1012(b) provides that federal antitrust law shall nonetheless be applicable "to the extent such business is not regulated by State law."  That clause is not helpful to plaintiff on their primary claim of injury -- that the private insurers have agreed not to offer private compulsory insurance -- because the state law precisely covers that topic.  Indeed, it requires the provision of the compulsory insurance.

-18-

A. The "Business of Insurance"

A key argument by the plaintiffs is that the challenged acts are not within the "business of insurance." The McCarran-Ferguson Act exemption encompasses only those state laws which are enacted "for the purpose of regulating the business of insurance, or which impose[] a fee or tax upon such business" and exempts only the regulated "business of insurance" from the antitrust laws. 15 U.S.C. § 1012(b).

The Court in Union Labor Life Insurance Co. v. Pireno, 458 U.S. 119, 129 (1982), articulated three criteria to test whether a particular practice is the business of insurance exempted from the antitrust laws under the McCarran-Ferguson Act: (1) "whether the practice has the effect of transferring or spreading a policyholder's risk"; (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured"; and (3) "whether the practice is limited to entities within the insurance industry." Id.

1. Business of Insurance -- Agreements Not To Sell and Not To Use Brokers

Under Royal Drug, the McCarran-Ferguson Act protects wholly intra-industry horizontal arrangements, even as to price, as part of the business of insurance. 440 U.S. at 221, 224 n.32. "[E]ven if the alleged horizontal agreement between the defendant insurers [in writing estimates at the same rate] did exist, it

-19-

would be immune from antitrust scrutiny under the McCarran-Ferguson Act." Quality Auto Body, Inc. v. Allstate Ins. Co., 660 F.2d 1195, 1201 (7th Cir. 1981).

The requirements under the "business of insurance" clause are tested not by the mere identity of the defendant as an insurance company but rather by whether the activity constitutes the business of insurance. Hartford Fire Ins. Co. v. California, 509 U.S. 764, 781-82 (1993). The shorthand version is that the exemption is for the "'business of insurance,' not the 'business of insurers.'" Royal Drug, 440 U.S. at 211.

Horizontal agreements among insurers to fix the price and to issue policies only through the residual market are within the business of insurance. See Slagle v. ITT Hartford, 102 F.3d 494, 497-98 (11th Cir. 1996) (Insurers' collective arrangement to issue windstorm insurance in parts of Florida only through joint underwriting association is within the "business of insurance."); Uniforce Temp. Pers., Inc. v. Nat'l Council on Comp. Ins., Inc., 87 F.3d 1296, 1299-1300 (11th Cir. 1996) (Insurers' collective rate-making activities to make workers' compensation insurance available to temporary employee provider only in the assigned risk or residual market is within the "business of insurance.").

It is also clear that the "business of insurance" covers the allegations concerning the effect on pricing that would occur if insurers did not use brokers and agents and kept any saved

expenses. While Royal Drug left open the question of whether the "business of insurance" includes the fixing of brokers' commissions, it read the legislative history of the McCarran-Ferguson Act to suggest that "'the business of insurance' may have been intended to include dealings within the insurance industry between insurers and agents." 440 U.S. at 224 n.32. Circuit courts have explicitly held that the decision to use or not use agents to market and solicit for policies, the very behavior which the plaintiffs attack here, is within the "business of insurance." See, e.g., Owens v. Aetna Life & Cas. Co., 654 F.2d 218, 225-26 (3d Cir. 1981) (holding that "business of insurance" includes "authorizing agents to solicit individual or group policies").

Thus, the gravamen of plaintiffs' complaint -- that the insurers, among themselves and with the JUA, agreed not to provide compulsory insurance as private insurers and not to use brokers to sell policies -- deals with the business of insurance and is within the scope of the McCarran-Ferguson Act.

2. Business of Insurance -- The JUA's Prohibition on the Use of OEM parts.

The plaintiffs' allegations about the JUA's repair practices are as follows:

> 55.C.(a) The monopoly has allowed the [JUA] to freely dictate the practices relating to the adjustment of claims allowing said [JUA] to establish unreasonable depreciation percentages for the replacement of new parts

-21-

> to be replaced; repairing vehicles with old
> parts obtained from "[j]unkers"; creating a
> complicated and unfair system of diagrams for
> the determination of fault to the detriment of
> the affected member[s] of the class.  This
> monopoly and absence of competition has
> resulted in the diminution of the quality of
> service as the insureds have became [sic]
> captives of the [JUA] without any possibility
> of escaping.

Although the terms of the standard insurance policy of the compulsory insurance program do not specify practices on repair parts, we understand the allegations to mean that the JUA subjects consumers to certain depreciation practices and to a non-OEM parts requirement.  It is not clear how this is carried out: conceivably the requirements are imposed directly on the policyholders or perhaps the JUA refers consumers to garages which adhere to these practices.  The precise mechanism makes no difference.

This claim is essentially a contract dispute between the policyholder and the JUA; the claim is about the "business of

insurance."[8]  See Gilchrist v. State Farm Mut. Auto. Ins. Co., 390

F.3d 1327, 1332-34 (11th Cir. 2004).

More significantly, no serious antitrust claim is

presented.  The plaintiffs argue that the JUA is using its monopoly

to increase its profits through using cheap parts without charging

cheaper prices.  But a monopolist is entitled to exploit a monopoly

in order to maximize its profits.  See III Areeda and Hovenkamp,

Antitrust Law, ¶ 720a (2d ed. 2000).  "Monopoly pricing and

monopoly profits are neither 'exclusionary' acts nor 'abuses' of

monopoly power under §2 [of the Sherman Act]."  Id. at 254.  A

monopolist "is free to exploit whatever market power it may possess

when that exploitation takes the form of charging uncompetitive

prices."  Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922, 927

(1st Cir. 1984) (holding it was lawful for health insurer to

---

[8]We distinguish between this case and the different situation
when an excluded third party provider, say an automobile repair
shop, challenged an agreement between the JUA and auto shops.  No
such claim is made here.  See Royal Drug, 440 U.S. at 232-33.  Even
while horizontal agreements fixing maximum prices have been held to
be within the McCarran-Ferguson Act exemption, vertical agreements
between the car insurers and the repair shops on maximum prices are
not.  See Proctor v. State Farm Mut. Auto. Ins. Co., 675 F.2d 308,
312, 336-37 (D.C. Cir. 1982); Quality Auto Body, Inc. v. Allstate
Ins. Co., 660 F.2d 1195, 1201-02 (7th Cir. 1981); see also
Brillhart v. Mut. Med. Ins., Inc., 768 F.2d 196, 199-200 & n.3 (7th
Cir. 1985) (finding health insurer-physician agreements to be
vertical agreements for the purchase of services and not the
business of insurance); Liberty Glass Co. v. Allstate Ins. Co., 607
F.2d 135, 136-38 (5th Cir. 1979) (finding arrangements between auto
insurers and certain car glass installers for the insurers to
contract only with those glass installers to install glass for the
insurers' policyholders did not fall within the "business of
insurance.").

require participating physicians to refrain from billing insurer's subscribers extra charges even assuming that health insurer had market power in the buying market); see also Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 297 (2d Cir. 1979) ("[M]ore than monopoly power is necessary to make the charging of a noncompetitive price unlawful.").

B. The Boycott Exception: Agreement Not To Sell and Coercion of Casellas

We turn to the exception to the McCarran-Ferguson Act exemption for "boycott, coercion, or intimidation" contained in 15 U.S.C. § 1013(b).

Recall that the plaintiffs allege two different types of concerted actions. The first (and main claim) is a concerted action by private insurers horizontally to agree not to provide compulsory low-risk insurance to consumers, but to force consumers to buy through the JUA. The second is a claim that the private insurers coerced and intimidated an insurance broker, Casellas, in several ways, such as threatening clients of Casellas not to do business with the broker if the broker continued to attempt to sell compulsory insurance, and telling other members in the insurance community that Casellas's attempts to sell compulsory insurance through private companies were illegal. The plaintiffs allege that the private insurers did so in order to retaliate against the broker for attempting to place customers' orders for compulsory

insurance with the private insurers (and not the JUA) and, it may be inferred (taking all inferences in the plaintiffs' favor), to punish Casellas for successfully inducing one insurance company, Seguros Triple SSS, Inc., to accept 128 policies from consumers (thus breaking ranks with the other insurers who had agreed to stay out of the market). The complaint does not allege retaliation directly against Seguros Triple SSS, Inc., the insurer who broke ranks, but only against the broker who induced it to do so.

### 1. Boycott: Private Insurers' Agreement Not To Sell

Assuming there was an agreement not to sell, as alleged, these allegations do not show a boycott. It has been repeatedly held that insurers' refusal to sell insurance other than at rates fixed through intra-industry rate-making associations do not constitute a boycott. See, e.g., Slagle, 102 F.3d at 499 (Insurers' collective refusal to issue windstorm insurance on open market in parts of Florida except through joint underwriting association is not a boycott.); Uniforce Temp. Pers., Inc., 87 F.3d at 1300 (Insurers' collective refusal to sell workers' compensation insurance to temporary employee provider except in the assigned risk or residual market is not a boycott.). It may be a violation of state law for private insurers to reject applications from qualified applicants for the compulsory insurance when Law 253 says that they must provide such coverage. 26 P.R. Laws Ann. § 8054(a).

But it was not a boycott for the insurers collectively to agree that they would not offer compulsory vehicle insurance except through the JUA.

Rather, such an agreement, if there was one, created a permissible cartel. See Hartford, 509 U.S. at 802 (The members of a cartel "are not engaging in a boycott, because: They are not coercing anyone, at least in the usual sense of that word; they are merely (though concertedly) saying 'we will deal with you only on the following trade terms.'" (internal quotation marks and citation omitted)); I Areeda and Hovenkamp, supra, ¶ 220a, at 351-52. As a result, their activities also do not constitute coercion or intimidation. See Hartford, 509 U.S. at 808 n.6 ("Once it is determined that the actions of the []insurers did not constitute a 'boycott,' . . . it follows that their actions do not constitute 'coercion' or 'intimidation' within the meaning of the statute. That is because . . . such concerted agreements do not coerce anyone, at least in the usual sense of that word . . . ." (internal quotation marks, citation, and alteration omitted)).

The boycott exception must mean something other than the usual horizontal agreement, when it is part of the business of insurance of the state, to fix rates and terms of coverage. See I Areeda and Hovenkamp, supra, ¶ 220b, at 347. The McCarran-Ferguson Act's "primary concern that cooperative ratemaking would be protected from the antitrust laws" and protection of "cooperative

rate regulation" within the industry further argue against finding a "boycott" in these allegations.  Royal Drug, 440 U.S. at 223-24.

In  Hartford Fire Insurance Co.,  the Supreme Court emphasized that it is crucial "to distinguish between a conditional boycott and a concerted agreement to seek particular terms in particular transactions."  509 U.S. at 801-02.  A conditional boycott seeks to coerce the target of the boycott into acceding to certain demands by means of refusal to deal with the target in collateral, unrelated transactions.  See id. at 801-03.[9]  "It is this expansion of the refusal to deal beyond the targeted transaction that gives great coercive force to a commercial boycott: unrelated transactions are used as leverage to achieve the terms desired."  Id. at 802-03.  The Hartford Court found that it was not a boycott for reinsurers to collectively refuse to reinsure certain types of commercial general liability (CGL) insurance policies because those policies contain undesirable terms: that is because the refusal is limited to the CGL reinsurance transaction itself.  Id. at 806.  So too here.[10]

---

[9]This is more consistent with standard usage of the term "boycott."  See Black's Law Dictionary 198 (8th ed. 2004) (defining "boycott" as "[a] refusal to deal in one transaction in an effort to obtain terms desired in a second transaction").

[10]One further twist about pressure on rivals unwilling to join should be addressed.  "The McCarran Act allows rivals to come together and eliminate competition among themselves but not to compel unwilling rivals to join their cartel."  I Areeda and Hovenkamp, supra, § 220a, at 352.  When cartel members attempt to coerce recalcitrant members through devices involving pressure on third parties and their relationships, concerns about boycott are

-27-

## 2. Boycott: Coercion Targeted At Casellas

The allegations about coercion and threats targeted at the broker, Casellas, and the broker's clients, fit more squarely within the boycott exception. See Hartford, 509 U.S. at 810-11 (holding that allegation that defendant insurers and reinsurers told "groups of insurance brokers and agents . . . that a reinsurance boycott, and thus loss of income to the agents and brokers who would be unable to find available markets for their customers, would ensue" if the terms desired by defendants in commercial general liability insurance were not approved, was a boycott under the McCarran-Ferguson Act). Such allegations of coercion on Casellas are within the boycott exception to the McCarran-Ferguson act's insurance exemption.[11]

---

heightened. See In re Workers' Comp. Ins. Antitrust Litig., 867 F.2d 1552, 1560, 1567 (8th Cir. 1989). However, plaintiffs do not make any allegations that there were acts of retaliation against Seguros Triple SSS, Inc., the insurance company who broke ranks and sold the private compulsory insurance to Casellas's customers. Nor do they allege other enforcement activity against recalcitrant members of the cartel.

[11]The defendants include a letter in the record from the Office of the Insurance Commissioner, indicating that an investigation of Casellas's allegations revealed no evidence of wrongdoing by the defendants. For purposes of the Rule 12(b)(6) analysis, we assume the plaintiffs' allegations are true and do not take this letter into account.

State Action Immunity

The defendants argue that they are nonetheless entitled to dismissal of all claims on state action immunity grounds. We disagree.

To obtain state action immunity under Parker v. Brown, 317 U.S. 341 (1943), the state must manifest intent to intervene in the market, displacing antitrust laws and must engage in active supervision of the challenged conduct. I Areeda and Hovenkamp, supra, ¶ 221c, at 362. Stated another way: first, "the challenged restraint [on trade] must be one clearly articulated and affirmatively expressed as state policy"; and second, "the policy must be actively supervised by the State itself." Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc. 445 U.S. 97, 105 (1980) (internal quotation marks omitted). The requirements for Parker immunity are significantly more stringent than the requirements for state regulation of the business of insurance under the McCarran-Ferguson Act. I Areeda and Hovenkamp, supra, ¶ 219c, at 342. Mere availability of state insurance regulation is insufficient to confer Parker immunity. A state's general authority over or passive acceptance of a regulated firm's position does not confer Parker immunity. Id.

There is a more important point. Since the surviving boycott claim now does not call into question the acts of the

commonwealth or the Insurance Commissioner, and the JUA is not a state agency, Parker immunity is not applicable. Cantor v. Detroit Edison Co., 428 U.S. 579, 591-92 (1976). Further, none of the boycott conduct complained of was mandated or even authorized by the state. Id. at 594-95.

**V.**

Although we may affirm the district court's dismissal on any grounds supported by the record, Aldridge v. A.T. Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002), none of the defendants' remaining grounds for dismissal of the boycott claim are persuasive.

A. Antitrust Standing

There are six nonexclusive factors to consider in determining whether a plaintiff has antitrust standing: "(1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ('antitrust injury'); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages." Sullivan v. Tagliabue, 25 F.3d 43, 46 (1st Cir. 1994) (citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 537-45 (1983)).

In many ways the standing question is the most difficult issue in the case. Whether the alleged boycott of Casellas has in fact caused any injury to the plaintiffs is hard to know.

We deal only with the lack of standing arguments articulated by the defendants. The defendants concede improper motives were alleged, but argue that this alone is insufficient to give standing. They argue any damages were speculative and that the damages sought will require complex apportionment. Finally, they argue that this case would involve duplicative recovery because there are two pending state actions about the system. But it is far from clear what is at issue in these actions. This argument is also inconsistent with their argument that any damages would be too speculative or difficult to apportion.

We cannot say, at the Rule 12(b)(6) stage, that the plaintiffs have no antitrust standing. See Morales-Villalobos v. Garcia-Llorens, 316 F.3d 51, 55-56 (1st Cir. 2003). As to several of the criteria, we note that the plaintiffs here are consumers and as such are presumptively favored as appropriate plaintiffs to assert antitrust injury. SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 45 (1st Cir. 1995).

As to the surviving boycott allegation, typically the plaintiffs in such cases, unlike here, are themselves the targets of the boycotts, but status as the target is by no means necessary. See, e.g., Hartford, 509 U.S. at 770 (The plaintiffs, nineteen

-31-

states and private parties, sued CGL insurers and reinsurers whose alleged boycott was against recalcitrant insurers.); In re Workers' Comp. Ins. Antitrust Litig., 867 F.2d at 1554 (The plaintiffs, private employers, sued workers' compensation insurers and insurers' collective rating association for using a cooperative agreement not to charge less than the maximum lawful rate; the agreement was a boycott because it may be enforced against recalcitrant rating association members by expelling them so that they can no longer sell workers' compensation insurance.); see also Blue Shield of Va. v. McCready, 457 U.S. 465, 478 (1982) (rejecting argument that patients of psychologists have no antitrust injury and no standing to sue under the antitrust laws where the alleged conspiracy between health insurer and organization of psychiatrists was aimed to keep psychologists out of the market).

At the Rule 12(b)(6) stage, we cannot conclude that the alleged antitrust activities could not be proven to be a but-for cause of the harm the consumers allegedly suffered. See SAS of P.R., Inc., 48 F.3d at 46 (affirming dismissal of case because, even assuming harm-causing antitrust violation, the plaintiff was not the appropriate plaintiff). Such causation issues are often decided at summary judgment, not on the pleadings, precisely because they depend on some factual development. See, e.g., Morales-Villalobos, 316 F.3d at 55-56; RSA Media, Inc. v. AK Media Group, Inc., 260 F.3d 10, 15 (1st Cir. 2001) (finding against

plaintiff on causation issue at summary judgment); Sullivan, 25 F.3d at 51 (same). Dismissal at the pleadings stage is more often associated with disfavored plaintiffs, not consumers, such as distributors or suppliers injured by anti-competitive threats directed towards others. See Serpa Corp. v. McWane, Inc., 199 F.3d 6, 13 (1st Cir. 1999); SAS of P.R., Inc., 48 F.3d at 44.

B.  Filed Rate Doctrine

The defendants argue that the plaintiffs' claims are barred by the filed rate doctrine because the claims are really an attack on the reasonableness of the "uniform premium" set by Law 253 and overseen by the Insurance Commissioner. See 26 P.R. Laws Ann. § 8056. The plaintiffs are emphatic that they are not attacking the rate which the Puerto Rico legislature has set for compulsory insurance, and there is no claim in the complaint that the JUA's rate is unreasonable.

The filed rate doctrine has its origins as a judicially created bar to antitrust damages claims in the context of the Interstate Commerce Commission's regulation of common carrier rates. Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409 (1986); Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156 (1922). The doctrine "is actually a set of rules that have evolved over time but revolve around the notion that [where regulated entities are required to file rates with the regulatory agency],

utility filings with the regulatory agency prevail over unfiled contracts or other claims seeking different rates or terms than those reflected in the filings with the agency." Town of Norwood v. F.E.R.C., 217 F.3d 24, 28 (1st Cir. 2000). All that is left of the plaintiffs' federal antitrust action are the claims of boycott of Casellas. We think that boycott has little to do with the filed rate doctrine, a famously complex and sometimes criticized set of rules. See Town of Norwood v. New Eng. Power Co., 202 F.3d 408, 420 (1st Cir. 2000) ("[T]he law on the filed rate doctrine is extremely creaky."). There is no direct relationship at all and it is simply not the case that any action which might arguably and coincidentally implicate rates, much less those determined by a state, rather than a federal agency, is governed by the doctrine. See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1159 (3d Cir. 1993).


C.  Primary Jurisdiction

Similarly, the primary jurisdiction doctrine has little to do with this case and it certainly does not go to the subject matter jurisdiction of the federal court. P.R. Mar. Shipping Auth. v. Fed. Mar. Comm'n, 75 F.3d 63, 67 (1st Cir. 1996). It is not appropriately used here as a defense in any event.

Generally, the doctrine's application depends on three factors: "(1) whether the agency determination lay at the heart of

the task assigned the agency by [the legislature]; (2) whether agency expertise was required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court."  Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580-81 (1st Cir. 1979). None of these conditions are met here.


D.  Lack of Substantial Impact on Interstate Commerce

Defendants finally argue that the jurisdictional requirements of the Sherman Act are not satisfied here because the activities described in the complaint do not substantially affect interstate commerce. See McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 242 (1980).

This argument is frivolous in its own terms.  The plaintiffs allege that the defendants, some of whom are global insurers, have invested the extra profits from their monopoly scheme outside of Puerto Rico and made it more difficult for the plaintiffs to purchase, repair, and maintain cars obtained in interstate commerce.  In light of the allegation that some "1.5 million to 2 million" vehicle owners in Puerto Rico are policyholders of the compulsory insurance, "as a matter of practical economics," the complaint, at least for Rule 12(b)(6) purposes, states a "not insubstantial effect on the interstate commerce" sufficient for the Sherman Act.  Cordova & Simonpietri

Ins. Agency Inc. v. Chase Manhattan Bank, N.A., 649 F.2d 36, 45 (1st Cir. 1981) (quoting McLain, 444 U.S. at 246).

Conclusion

It was the defendants who chose to test the plaintiffs' case on the pleadings, and we hold no more than that, as to the Casellas boycott federal antitrust claims, the case survives.

We reverse the judgment of dismissal with respect to that one claim and remand the case for further proceedings consistent with this opinion.  No costs are awarded.

The plaintiffs' complaint contains the following relevant allegations:

12. The defendant insurance companies acting jointly, in concert and in agreement with each other and with [the directors of the JUA], agreed to implement a boycott against all motor vehicle owners whereby none of the ten [sic] private insurance companies would issue to the owners of motor vehicles covered by Law 253, supra, the compulsory insurance policy . . . and would cause and achieve that all said motor vehicle owners be insured with respect to said compulsory insurance policies only by the [JUA].

13. The main and principal reason for such concerted scheme and boycott was of course the obtention [sic] of larger profits for all of the defendants. As the [JUA] is exempted from income and other taxes, if the [JUA] became the sole insurer of all vehicles having only compulsory insurance, all the premiums would accrue tax free to the [JUA] to be later distributed among the defendant's [sic] participating insurance companies members of the [JUA]. The monopoly obtained by a successful boycott would lower their costs as no written insurance policies would be issued with a savings of around $4.00. They would also economize in the payment of the commission to the brokers and agents with another savings of 8% of the insurance premium as they would cover the insured directly without the intervention of an agent or broker as required by law when coverage is issued by a private insurer. Other economies would be obtained by the monopolization in the adjustment of the claims and other administrative expenses. As herein further alleged, they have been successful and have been able to accumulate extraordinary profits.

19. By April 1999, a "super syndicate" was created and the [JUA] was issuing compulsory insurance on virtually the whole universe of vehicle owners operating in Puerto Rico not having traditional insurance. . . .

21. Not only did they concertedly remain inactive in promoting the offering of the compulsory insurance but also went further in their concerted boycott and each of them systematically rejected all applications by brokers and agents to the ten [sic] defendant insurance companies.

26. On August 31st, 2000 it was co-defendant Seguros Triple S, [sic] Inc. who rejected the applications for compulsory insurance submitted by Casellas and Co. [a broker] This company later agreed to issue 128 policies but limiting the commission to Casellas to only 3% instead of 8% as established in the premium distribution.

32. By October 16th, 2000 Casellas and Co. had around 40,000 insurance applications including broker designation for compulsory insurance that the defendants had consistently refused to accept.

38. [The defendants' agents] represented to be private detectives investigating insurance fraud. They would take photos and make[] statements to the employees and owners of the inspection centers to the effect that Casellas and Co. was committing fraud; that he was forcing and coercing vehicle owners to sign applications; that he was doing illegal acts; that the persons who did business with Casellas could go to jail; that Casellas promises could not be trusted; and other similar disparaging comments casting aspersions against Casellas and Co. with the purpose of intimidating potential customers of compulsory insurance policies and dissuade them from doing to business with Casellas and Co.

40. The plan and efforts of intimidation and coercion were also practiced by the defendants who threatened clients of Casellas and Co. not to do business with said broker if he would continue with his attempts to sell compulsory insurance and telling members of the insurance business community that what he was doing was illegal.

55.C.(a) The monopoly has allowed the [JUA] to freely dictate the practices relating to the adjustment of claims allowing said [JUA] to establish unreasonable depreciation percentages for the replacement of new parts to be replaced; repairing vehicles with old parts obtained from "[j]unkers"; creating a complicated and unfair system of diagrams for the determination of fault to the detriment of the affected member[s] of the class. This monopoly and absence of competition has resulted in the diminution of the quality of service as the insureds have became [sic] captives of the [JUA] without any possibility of escaping.

63. [The plaintiffs] have been deprived of the right to receive written policies and the services and quality of service based on a system of competition. Had the law intended that no written policies were to be issued and no brokers or competing insurance companies would participate, the premiums could have been fixed lower (at least 12% less than the one established). . . .