# United States Court of Appeals
## For the First Circuit

No. 21-1115

ROBERTO VÁZQUEZ-RAMOS; IRMA VÁZQUEZ-RAMOS; CONJUGAL PARTNERSHIP VÁZQUEZ-RAMOS; JAVIER E. COLÓN-IRIZARRY; ADVANCED UROLOGY GROUP, LLC; LUIS M. MUÑIZ-COLÓN; WEST UROLOGY GROUP PSC; JUAN M. COLÓN-RIVERA; CARIBBEAN UROCENTRE, CSP,

Plaintiffs, Appellants,

v.

TRIPLE-S SALUD, INC.; HÉCTOR M. RODRÍGUEZ-BLÁZQUEZ; UROLOGICS, LLC; MSO OF PUERTO RICO, LLC; UROLOGIST, LLC,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Silvia Carreńo-Coll, U.S. District Judge]

---

Before

Lynch and Kayatta, Circuit Judges,
and Woodlock,[*] District Judge.

---

Jorge Martínez-Luciano, with whom Emil Rodríquez-Escudero and M.L. & R.E. Law Firm were on brief, for appellants.
César T. Alcover, with whom Carla S. Loubriel Carríon and Casellas Alcover & Burgos, PSC were on brief, for appellees Urologics, LLC; Urologist, LLC; and Héctor Rodríguez-Blázquez.
Luis R. Roman-Negron, for appellee Triple-S Salud, Inc.
Iván J. Lladó, with whom Ramón E. Dapena and Morell Cartagena & Dapena were on brief, for appellee MSO of Puerto Rico, LLC.

---

[*] Of the District of Massachusetts, sitting by designation.

December 8, 2022

**KAYATTA**, <u>Circuit Judge</u>. This appeal arises from the dismissal under Federal Rule of Civil Procedure 12(b)(6) of an attempted antitrust challenge to what look to be standard exclusive dealing arrangements incident to the maintenance of closed health care networks. Such challenges rarely succeed, largely because such arrangements rarely pose significant harm to competition and are often pro-competitive. <u>See, e.g.</u>, <u>Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.</u>, 373 F.3d 57, 62, 65-66 (1st Cir. 2004); <u>U.S. Healthcare, Inc.</u> v. <u>Healthsource, Inc.</u>, 986 F.2d 589, 595 (1st Cir. 1993); <u>Cap. Imaging Assocs., P.C.</u> v. <u>Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 545-47 (2d Cir. 1993); <u>B&H Med., L.L.C.</u> v. <u>ABP Admin., Inc.</u>, No. 02-73615, 2004 WL 7347089, at *14 (E.D. Mich. Oct. 29, 2004), <u>aff'd</u>, 526 F.3d 257 (6th Cir. 2008). That being said, the issue now is not whether the difficulty of prevailing on such claims is daunting. Rather, the only issue is whether the amended complaint does enough to "state a claim to relief that is plausible on its face." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007). For the following reasons, we find that, in part, it does.

- 3 -

We begin by summarizing the relevant aspects of the two public health insurance programs at issue before turning to plaintiffs' claims and the proceedings below. In so doing, we "accept[] all well-pleaded allegations of plaintiffs as true and afford[] all inferences in the plaintiffs' favor." Arroyo-Melecio v. Puerto Rican Am. Ins. Co., 398 F.3d 56, 65 (1st Cir. 2005).

**A.**

Prior to 1993, healthcare for medically indigent populations in Puerto Rico was largely provided through publicly owned facilities operated by local governments. In 1993, the Commonwealth sought to improve the provision of public healthcare on the island by passing Act 72, see P.R. Laws Ann. tit. 24, § 7001 et seq. (1993), which privatized most healthcare facilities and created a new government-run healthcare plan (branded as Mi Salud at the time of the relevant events). See id. § 7025. Mi Salud operated as a public health insurance system funded mostly through Medicaid grants and funds collected from the Commonwealth and municipal governments. Act 72 also created the Puerto Rico Health Insurance Administration ("ASES," by its Spanish acronym), see id. § 7001, and delegated the administration of Mi Salud to that agency, see id. §§ 7003-04.

To implement Mi Salud, ASES divided Puerto Rico into eight geographical regions and assigned a single private

- 4 -

healthcare insurer to each region. The agency then entered into contracts with the insurers to deliver the required services in the insurers' respective regions. The designated insurers in each region were tasked with contracting with healthcare providers to provide covered services to Mi Salud patients in the region. As relevant to this appeal, ASES retained defendant Triple-S Salud, Inc. ("Triple-S") as the Mi Salud insurer for the Western Region of Puerto Rico, an area encompassing over 200,000 medically indigent patients.[1]

In conjunction with the federal government, the Commonwealth also operates a health insurance system called the Medicare Advantage Program (also known as Medicare Part C). Medicare Advantage provides coverage to qualified beneficiaries under the Medicare Act, 42 U.S.C. § 1395 et seq., which generally covers elderly and disabled individuals. Private insurers enter into contracts with the federal government to manage Medicare Advantage plans for people in Puerto Rico. Medicare y Mucho Más ("MMM"), one such insurer, is one of the largest Medicare Advantage Program coverage facilitators in Puerto Rico. Defendant MSO of Puerto Rico, LLC ("MSO") is the administrator of the provider network for the Medicare Advantage population insured by MMM and

---

[1] In November 2018, Mi Salud was rebranded as Vital and abandoned the regional model. See Vázquez-Ramos v. Triple-S Salud, Inc., Civ. No.: 19-1527, 2020 WL 8513843, at *1 n.1 (D.P.R. Dec. 15, 2020).

contracts with physicians and healthcare providers to serve MMM's Medicare Advantage patients.

**B.**

Plaintiffs are urologists and urology practices with offices in the Western Region of Puerto Rico. Until the summer of 2015, plaintiffs were under contract with Triple-S to provide urology services to urology patients in the area. A subset of the plaintiffs -- Dr. Roberto Vázquez-Ramos, Dr. Javier Colón-Rivera, and Caribbean Urocentre, CSP ("Medicare Advantage plaintiffs") -- were also under contract with MSO to provide urology services to qualified MMM Medicare Advantage patients in Western Puerto Rico.

In early 2015, unbeknownst to plaintiffs, Triple-S began conversations with Dr. Rodríguez-Blázquez, a competitor urologist, about having Dr. Rodríguez and companies owned by him (collectively, "Urologics") become the exclusive provider of urology services for Mi Salud patients in Western Puerto Rico. MSO had similar conversations with Urologics regarding MMM patients. After these conversations, Triple-S and MSO both declined to renew their contracts with various plaintiffs and instead both entered into separate agreements with Urologics for Urologics to become their exclusive urology provider in Western Puerto Rico. The amended complaint alleges two markets relevant to plaintiffs' claims: the market of Mi Salud patients in Western Puerto Rico and the market of MMM Medicare Advantage patients in

Western Puerto Rico. Plaintiffs claim that the exclusive dealing agreements excluded them from one or both of those markets in a manner that constitutes both an unlawful agreement under section 1 of the Sherman Act, 15 U.S.C. § 1, and an unlawful acquisition and use of monopoly power under section 2 of the Sherman Act, id. § 2. Plaintiffs also allege parallel claims under the Commonwealth's competition and tort laws. In neither instance do plaintiffs allege any concerted action between Triple-S and MSO.

Plaintiffs assert that the exclusive dealing arrangements have caused them to lose business and have made it more difficult for patients to obtain adequate urology services in Western Puerto Rico. Plaintiffs further contend that Mi Salud patients have received lower quality care following the Triple-S/Urologics agreement due to Urologics' purported inability to sufficiently provide coverage to the region and to its alleged practice of prioritizing profits over efficacy in its treatment decisions.[2]

---

[2] Urologics contends that ASES -- as the agency empowered to hear and resolve grievances over administration of the Mi Salud program -- has exclusive primary jurisdiction to resolve plaintiffs' claims as to the quality of urology services provided to Mi Salud patients. We have explained previously that "the primary jurisdiction doctrine has little to do" with federal antitrust cases "and it certainly does not go to the subject matter jurisdiction of the federal court." Arroyo-Melecio, 398 F.3d at 73; see also P.R. Mar. Shipping Auth. v. Fed. Mar. Comm'n, 75 F.3d 63, 67 (1st Cir. 1996). In any event, issues of patient care play no dispositive role in our decision concerning the sufficiency of plaintiffs' pleading.

The district court granted defendants' motion to dismiss plaintiffs' amended complaint. First, the court held that plaintiffs lacked antitrust standing -- a prudential requirement designed to ensure that plaintiffs are the proper parties to bring federal antitrust claims. See Vázquez-Ramos v. Triple-S Salud, Inc., Civ. No.: 19-1527, 2020 WL 8513843, at *3 (D.P.R. Dec. 15, 2020). Second, and in the alternative, the district court concluded that the amended complaint failed to state a claim under either section 1 or section 2 of the Sherman Act. See id. at *4-5. Finally, having dismissed all the federal claims, the district court declined to exercise supplemental jurisdiction over plaintiffs' remaining Commonwealth law antitrust and tort claims and dismissed those claims without prejudice. See id. at *5-6. Dissatisfied with this outcome, plaintiffs timely appealed.

## II.

We review a motion to dismiss de novo. Arroyo-Melecio, 398 F.3d at 65. Before delving into the merits of plaintiffs' claims, we first consider whether plaintiffs have standing to proceed with their federal antitrust action.

Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, create private causes of action for violations of federal antitrust law.[3] To bring such claims, plaintiffs must not only

---

[3] Section 4 establishes that "any person who shall be injured in his business or property by reason of anything forbidden in the

- 8 -

meet the typical requirements of Article III standing but also the requirements of the so-called "antitrust standing" doctrine. See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983). In this appeal, no defendant contests plaintiffs' Article III standing. Nor have we any doubts on that front. The only question is whether plaintiffs also have antitrust standing.

The purpose of the antitrust standing doctrine is "to avoid overdeterrence" and to "ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability." Serpa Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999) (quoting Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1449 (11th Cir. 1991)). To further this purpose, we seek to ensure that the prospective antitrust plaintiff has suffered an injury of the kind antitrust laws were intended to prevent, such that the plaintiff is a proper party to bring a federal antitrust suit. To determine the existence of antitrust standing consistent with this purpose, we employ a six-factor test, assessing:

---

antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a). And section 16 provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." Id. § 26.

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff;
> (2) an improper motive;
> (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury");
> (4) the directness with which the alleged market restraint caused the asserted injury;
> (5) the speculative nature of the damages; and
> (6) the risk of duplicative recovery or complex apportionment of damages.

RSA Media, Inc. v. AK Media Grp., Inc., 260 F.3d 10, 14 (1st Cir. 2001) (quoting Serpa, 199 F.3d at 10).

Five of the above factors plainly point towards antitrust standing for plaintiffs in this case. The causal connection here is patent: The exclusive dealing arrangements plainly foreclose plaintiffs from selling their services to Triple-S and MSO. The motive, as alleged, is to improperly establish a monopoly for Urologics. The injury as alleged is direct. And damages seem calculable by establishing the value of lost sales. Conceivably, if consumers sued, there could be some double recovery, but that seems speculative at this point.

The remaining factor -- whether the injury is an "antitrust injury" -- is what gave the district court pause. The Supreme Court has defined an "antitrust injury" as "injury of the type the antitrust laws were intended to prevent and that flows

- 10 -

from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). In other words, the alleged injury must be "the type of injury the antitrust violation would cause to competition." Sterling Merch., Inc. v. Nestlé, S.A., 656 F.3d 112, 121 (1st Cir. 2011). Lack of an antitrust injury is typically enough by itself to negate standing. See RSA Media, 260 F.3d at 14.

The district court concluded that plaintiffs failed to allege any antitrust injury that was caused by defendants' allegedly anticompetitive arrangements. See Vázquez-Ramos, 2020 WL 8513843, at *3. With respect to the arrangement between Triple-S and Urologics, the court acknowledged that, although "Triple-S was the only option in the Western Region of Puerto Rico [Mi Salud market]" and "[patients] in that market only had one choice of insurer and therefore only one choice of urologist," the only proper plaintiffs to bring an antitrust claim in that market "would be the patients who are allegedly receiving inferior services, i.e., the customers, not the individual doctors who lost out on business when their services were no longer desirable." Id. And, with respect to the arrangement between MSO and Urologics, the court explained that there were "many other MMM providers in addition to MSO available in Western Puerto Rico," so patients did not have only one insurer and one urologist to choose from. Id.

- 11 -

This meant that "there was no antitrust injury as to MSO." Id.[4] For the following reasons, we disagree as to both of the challenged exclusive dealing arrangements -- between Triple-S and Urologics and between MSO and Urologics.

**A.**

We consider first whether plaintiffs allege antitrust injury as a result of the exclusive dealing arrangement between Triple-S and Urologics. The amended complaint plainly alleges a closed provider network in which all Triple-S insureds who want to obtain urology services paid for by Triple-S must do business with Urologics. That is to say, during the time period covered by the exclusive dealing agreement, Urologics' competitors are excluded from competing in the alleged market of Triple-S's 200,000 insureds in Western Puerto Rico. Having been directly harmed by the alleged elimination of competition in that alleged market, they have plainly suffered an antitrust injury (assuming that the challenged agreement is itself an antitrust violation). Nor is this by any means surprising. The competitor of an entity granted exclusive rights to a market is routinely the plaintiff that brings an antitrust complaint as the party directly harmed by the elimination

---

[4] Although plaintiffs bring independent claims under section 1 and section 2 of the Sherman Act, each of the alleged exclusive dealing arrangements provides the foundation of both corresponding claims. Accordingly, whether plaintiffs adequately alleged antitrust standing as to each claim depends on the same analysis. We therefore address them together.

of competition in the foreclosed market. SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 44 (1st Cir. 1995) (explaining that a presumptively proper plaintiff in an antitrust suit includes "a competitor who seeks to serve [a threatened] market"). Thus, even though plaintiffs are not competitors of Triple-S themselves, they are competitors of Urologics and are suing in that capacity.

None of this belies the district court's observation that the amended complaint also alleges that the challenged agreements harm patients as well. But we see no reason why the occurrence of that harm deprives plaintiffs of standing to sue for the economic effects of being foreclosed from selling services in an alleged market. In most exclusive dealing cases there will be someone like the patients here, i.e., someone who would have bought goods or services from plaintiff but for the exclusive dealing rights acquired by plaintiff's competitor. Indeed, the extent of such harm is relevant to determining whether the exclusive dealing arrangement is reasonable. See infra Section III(B)(1). If existence of such harm means that the vendor precluded from competing in the market cannot sue, then the exclusive arrangements most likely to be deemed unlawful cannot be challenged by those with the greatest incentive to sue. So, too, remedying any harm to consumers would not likely remedy the economic loss claimed by these plaintiffs. For these reasons, among others, the allegations

that the exclusive dealing arrangement harmed patients do not provide a basis for denying standing to plaintiffs.

Triple-S (not joined by Urologics) attempts one final argument, contending that there is no causal relationship between its decision to enter into an exclusivity agreement with Urologics and its decision not to renew its contracts with plaintiffs. Even assuming that Triple-S has no independent obligation to continue renewing its contracts with plaintiffs, that would not mean that Triple-S's decision to decline to renew those contracts is unrelated to its decision to enter into an allegedly anticompetitive agreement with Urologics. Indeed, as plaintiffs allege, the very purpose of the exclusive dealing arrangement between Triple-S and Urologics was to make Urologics Triple-S's sole urology provider in Western Puerto Rico. Given that goal, it should come as no surprise that Triple-S, in furtherance of its exclusivity arrangement with Urologics, declined to renew its contracts with plaintiffs. It is thus entirely plausible that Triple-S's decision not to deal with plaintiffs was causally related to its pact to deal exclusively with Urologics.

In sum, at the motion to dismiss stage, the allegations in the amended complaint plausibly establish that those plaintiffs who could have serviced Triple-S's Mi Salud patients but for the exclusive arrangement between Triple-S and Urologics have antitrust standing to challenge that arrangement.

- 14 -

**B.**

As for the exclusive dealing arrangement between MSO and Urologics, the standing allegations in the amended complaint against MSO are nearly identical to those against Triple-S. The three Medicare Advantage plaintiffs claim that they were excluded from competing in a market for urology services for MMM's Medicare Advantage patients in Western Puerto Rico due to MSO's exclusivity arrangement with Urologics. As with Triple-S, the amended complaint alleges that the Medicare Advantage plaintiffs suffered monetary losses as a result. Those losses, no less than the ones alleged by foreclosed Mi Salud providers, appear on their face to be of the type that the antitrust laws were intended to address.

As far as the district court's conclusion that there were alternative purchasers of MMM services in Western Puerto Rico, MSO acknowledges that the district court was in error when it stated that there are other MMM facilitators in addition to MSO. MMM works exclusively with MSO. As MSO explains in its briefing before this court, there are nevertheless other Medicare Advantage insurers (i.e., competitors of MMM) that operate in Western Puerto Rico. Plaintiffs do not contest this point. However, the significance of other available buyers of plaintiffs' services bears more on the degree of market foreclosure, and less (if at all) on whether the alleged foreclosure gives rise to antitrust injury.

- 15 -

In their briefing on antitrust standing, the Urologics and MSO defendants at various points also argue that the Medicare Advantage plaintiffs improperly defined the relevant market for their antitrust claims. Neither of these defendants, however, explain why the precise contours of the relevant market are relevant to assessing antitrust standing in this case as compared to the merits of those claims. Accordingly, we interpret defendants' market definition contentions as speaking to whether the Medicare Advantage plaintiffs adequately stated Sherman Act section 1 and section 2 claims, which we address next.

**III.**

Satisfied that all plaintiffs have standing to bring their federal antitrust claims, we proceed to assess whether the amended complaint actually alleges antitrust claims. Our review remains de novo. Arroyo-Melecio, 398 F.3d at 65.

Plaintiffs bring suit under two provisions of the Sherman Act: section 1, which proscribes contracts and conspiracies in restraint of trade; and section 2, which prohibits the monopolization or attempted monopolization of an area of trade. The district court held that plaintiffs failed to state a section 1 claim or a section 2 claim based on either the exclusive dealing arrangement between Triple-S and Urologics or the arrangement between MSO and Urologics. Vázquez-Ramos, 2020 WL 8513843, at *4-5. We find that the district court erred in dismissing the

claims involving Triple-S's arrangement with Urologics, but we agree with the district court that the claims involving MSO's arrangement must be dismissed. Our reasoning follows.

**A.**

We start with an element common to both claims against both parties: market power. Given that the amended complaint alleges no per se violations of the Sherman Act, all of plaintiffs' antitrust claims require "proof that [defendants] exercise[] or could exercise a threshold degree of market power." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016); see Ohio v. Am. Express Co., 138 S. Ct. 2274, 2285 (2018) (noting that "courts usually cannot properly apply the rule of reason" in a section 1 claim "without an accurate definition of the relevant market"); Díaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013) (explaining that "monopoly power" in the context of a section 2 claim "is typically proven by defining a relevant market and showing that the defendant has a dominant share of that market"). To that end, plaintiffs must in due course "adduc[e] enough evidence to permit a reasonable factfinder to define the relevant market." Flovac, 817 F.3d at 853. The relevant market is "the area of effective competition," Am. Express, 138 S. Ct. at 2285 (quoting Walker Process Equip., Inc., v. Food Mach. & Chem. Corp., 382 U.S. 172, 177 (1965)), and

- 17 -

includes both a "relevant geographic market" and a "relevant product market," Flovac, 817 F.3d at 853.

Plaintiffs allege that the relevant market for the agreement between Triple-S and Urologics is the narrow market of Mi Salud's 200,000 insureds in Western Puerto Rico. If that were the relevant market, then we would arguably have a case in which the exclusive arrangement closes off 100% of the market -- enough to get an adjudicator's attention depending on duration, justification, and other factors bearing on whether the defendants effectively dominate the market. See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 271-72 (3d Cir. 2012); United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191-97 (3d Cir. 2005). Conversely, defendants claim that the relevant market consists more broadly of all urology patients, whether insured by Triple-S or not, and not necessarily limited to Western Puerto Rico. There are other insurers, they allege, to whom plaintiffs may sell their services, as well as uninsured patients.

In Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island, we confronted a similar antitrust challenge to a health insurer's closed provider network raised following partial summary judgment on claims of per se antitrust violations and a directed verdict on the rule of reason antitrust claim. 373 F.3d 57 (1st Cir. 2004). We explained that "it was critical to any attack on [an] exclusive dealing arrangement . . . that

plaintiffs establish a relevant market and harm within it."  Id. at 66.  We further explained that the relevant market is the market for the "shut-out supplier," and is presumptively all customers, "not just that smaller sub-group consisting of customers insured by one or two insurers."  Id. at 67; see also Flovac, Inc. v. Airvac, Inc., 84 F. Supp. 3d 95, 104 (D.P.R. 2015), aff'd, 817 F.3d 849 (1st Cir. 2016) ("And where, as here, an antitrust plaintiff neglects to 'define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiffs' favor, the relevant market is legally insufficient.'" (quoting City of New York v. Grp. Health Inc., 649 F.3d 151, 155 (2d Cir. 2011))).

That being said, "well-defined submarkets may exist" inside a broad product market and may themselves "constitute product markets for antitrust purposes."  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  The boundaries of a defined submarket are "determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  Id.

In affirming judgment for defendants in Stop & Shop, we had the benefit of an evidentiary record including expert testimony on the subject of market definition. Our reliance on an evidentiary record in Stop & Shop was not aberrational. See U.S. Healthcare, Inc., 986 F.2d at 599 (noting that, "[i]n practice," the "question [of] how to define the product market is answered in antitrust cases by asking expert economists to testify" to issues including "[u]sage patterns, customer surveys, actual profit levels, comparison of features, ease of entry, and many other facts"); see also Morales-Villalobos v. García-Lloréns, 316 F.3d 51, 55 (1st Cir. 2003) ("[T]he matter [of market definition] cannot be resolved on the face of the complaint.").

Here, by contrast, we stand at the pleading threshold, with a record yet to be fleshed out with evidence and expert opinions. We therefore ask only whether the amended complaint alleges facts that plausibly delineate a relevant market. As to the Triple-S and Urologics arrangement, plaintiffs allege a market defined by the following characteristics: the geography delimited by ASES and Mi Salud (Western Puerto Rico), the indigency of the patients that qualifies them for Mi Salud and curtails their ability to seek healthcare elsewhere, and the reluctance of patients to travel long distances for medical care.

Whether there is such a market remains to be seen. Perhaps there is no sufficient reason to segment out Mi Salud

patients from those covered by other insurers, or those who are self-insured. Or perhaps many patients do travel between regions for services. The point for now is two-fold: Questions of fact remain about "the universe of products that are considered 'reasonably interchangeable by consumers for the same purposes,'" Flovac, 817 F.3d at 854 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)); and we typically "do not require that the plaintiffs provide precise figures and calculations at the pleading stage," for "[r]equiring such a high burden would impose a nearly insurmountable bar for plaintiffs," In re Loestrin 24 Fe Antitrust Litig., 814 F.3d 538, 552 (1st Cir. 2016); Morales-Villalobos, 316 F.3d at 55 (determining that, at the motion to dismiss stage, it was not yet clear whether the market foreclosure was "a trivial percentage" or "nearly complete," and thus the matter of market definition could not "be resolved on the face of the complaint" because defining the relevant geographic market "depends on circumstances").

As to the claims against MSO, the amended complaint alleges as the market the MMM Medicare Advantage population of Western Puerto Rico. The foregoing analysis applies equally to this alleged market -- "the matter . . . cannot be resolved on the face of the complaint." Morales-Villalobos, 316 F.3d at 55. Whether that market definition provides any foundation for the

claims against MSO on the merits is a matter we will separately address.

Accordingly, we find that the amended complaint adequately alleges a relevant market for purposes of parrying a motion to dismiss as to both challenged exclusive dealing arrangements. Whether the amended complaint in both instances also alleges the other required elements of the asserted antitrust claims is a matter to which we turn next, addressing separately the two challenged arrangements.

**B.**

**1.**

The amended complaint meets the requirements for stating a Sherman Act section 1 claim against Triple-S and Urologics. A section 1 claim has two components: "First, there must be concerted action"; and "[s]econd, the actors' agreement must involve either restrictions that are per se illegal or restraints of trade that fail scrutiny under the rule of reason." Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 16 (1st Cir. 2004). Section 1 also prohibits "only unreasonable restraints." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) (quoting State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)).

As to the first component, and contrary to what defendants claim, the arrangements as alleged plainly involve concerted action: Urologics agreed to concede "certain discounts

- 22 -

in favor of Triple-S, on account of the exclusive provider status that was being granted" and to "split" certain savings alleged to result from providing inferior and even harmful services. Indeed, the reciprocity established by the agreement resulted in lower prices for the insured patients, and thus for the insurer, and will likely be touted by defendants as evidence that the agreement is pro-competitive. In any event, the point for present purposes is that the pleading alleges facts that plausibly establish concerted action.

Moving to the second component, plaintiffs do not allege any per se illegality. Accordingly, all parties agree that a rule of reason analysis is appropriate for assessing the exclusive dealing arrangement at issue. Under the rule of reason, courts engage in a "fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." Am. Express, 138 S. Ct. at 2284 (alteration in original) (quoting Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 768 (1984)). The purpose of this inquiry is to distinguish between restraints of trade "that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." Leegin, 551 U.S. at 886.

Typically, courts apply a burden-shifting framework to determine whether a restraint violates the rule of reason. See Am. Express, 138 S. Ct. at 2284; see also Phillip E. Areeda &

Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1820a (5th ed. 2021). First, the plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." Am. Express, 138 S. Ct. at 2284. Then, the burden shifts to the defendant to demonstrate "a procompetitive rationale for the restraint." Id. Finally, the burden shifts back to the plaintiff to establish that "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." Id. Importantly, applying this framework usually requires some fairly detailed facts, the ascertainment of which is often beyond the scope of a Rule 12(b)(6) inquiry. See PLS.Com, LLC v. Nat'l Ass'n of Realtors, 32 F.4th 824, 839-40 (9th Cir. 2022) (explaining that "whether the alleged procompetitive benefits of [the challenged restraint] outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings"); see also E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, 357 F.3d 1, 5 (1st Cir. 2004) (describing the assessment as a "fact-intensive process").

As recounted in greater detail above, plaintiffs allege that the exclusive dealing arrangement between Triple-S and Urologics has shut them out of a plausibly relevant market entirely. The result of this exclusion has been an elimination of

their ability to compete and an alleged reduction in the quality of urology services for Mi Salud patients in Western Puerto Rico. Taking the allegations in the amended complaint as true, plaintiffs have, for pleading purposes, demonstrated "reduced output . . . [and] decreased quality in the relevant market," which constitute "[d]irect evidence" of anticompetitive effects. PLS.Com, LLC, 32 F.4th at 834 (quoting FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460 (1986)). We reiterate that "[i]t is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences"; rather, we may "only accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether conspiracy allegations may prove deficient at the summary judgment or later stages." Evergreen Partnering Grp. v. Pactiv Corp., 720 F.3d 33, 45 (1st Cir. 2013). To do otherwise would "frustrate the purpose of antitrust legislation and the policies informing it." Id. at 47.

As an alternative argument, Urologics points to a Letter of Intention and Confirmation of Preliminary Agreement between Triple-S and Urologics and to a participating physician agreement that contains a clause granting either party the right to terminate the agreement without cause on thirty days' notice. Urologics contends that the termination clause of the latter is incorporated into the former. If that were so, any possible market constraint

would likely be de minimis.  U.S. Healthcare, 986 F.2d at 596. But the cross-referencing language to which Urologics points refers to the incorporation of "obligations," and thus arguably not rights.[5] So whether either party retains the right to terminate the exclusive dealing arrangement on short notice remains to be seen.

To be sure, at subsequent stages in this litigation, plaintiffs' claim that the challenged arrangement harms competition in a relevant market may prove to be overblown, or defendants might well show that the exclusive dealing arrangement between Triple-S and Urologics actually has a procompetitive effect.  But at this stage, we are obliged to "accept[] all well-pleaded allegations of the plaintiffs as true and afford[] all inferences in the plaintiffs' favor." Arroyo-Melecio, 398 F.3d at 65.

We therefore conclude that plaintiffs have stated a Sherman Act section 1 claim based on the exclusive dealing arrangement between Triple-S and Urologics.

**2.**

We next assess whether plaintiffs adequately plead a Sherman Act section 2 claim against Triple-S and Urologics.  The

---

[5]  The clause reads:  "any obligation that arises from the contract of a participating provider . . . [will] also be applicable to this agreement" (emphasis supplied).

key questions for establishing a section 2 violation are whether the plaintiff has demonstrated that one of the defendants possessed "monopoly power in the relevant market" and whether that defendant acquired or maintained that power by "improper means." Town of Concord v. Bos. Edison Co., 915 F.2d 17, 21 (1st Cir. 1990); see also Arroyo-Melecio, 398 F.3d at 66 (explaining that a section 2 claim "requires monopoly or near monopoly power in some market, and a wrongful exclusionary act designed to enhance such power in that market or to achieve an improper advantage in another market" (quoting Town of Norwood v. New Eng. Power Co., 202 F.3d 408, 420-21 (1st. Cir. 2000))).

We assume for the purposes of the motion to dismiss, as with the section 1 claim, that the relevant market for the section 2 claim is Mi Salud patients needing urological care in Western Puerto Rico. Plaintiffs allege that Urologics is the sole provider of urology services to Mi Salud patients in Western Puerto Rico, giving it monopoly power in the relevant market and leaving patients with only one choice of provider. Plaintiffs also allege that Urologics acquired this monopoly power not through any skill or merit but through improper means, namely an anticompetitive exclusive dealing arrangement with Triple-S that was designed to monopolize the relevant market and keep plaintiffs from competing in that market. We have noted that "exclusive dealing" is an improper means of maintaining monopoly power for the purposes of

section 2.  See Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 61 (1st Cir. 2002) ("In section 2 cases, the wrongful act is usually one designed to exclude competitors from the market (e.g., predatory price, exclusive dealing).").  Together, these allegations are sufficient, at the pleading stage, to establish a plausible section 2 claim against Triple-S and Urologics.

Triple-S and Urologics argue in response that there can be no section 2 violation because Triple-S's position as the exclusive insurer for the Mi Salud program in Western Puerto Rico was conferred to it by the government of Puerto Rico through a contract with ASES.  That is, they contend that Triple-S's monopoly power was the product of state action rather than any allegedly anticompetitive conduct involving the defendants.  This argument, however, misses a crucial detail.  Plaintiffs' amended complaint does not target only the monopoly power held by Triple-S as the sole insurer in the relevant market.  Rather, plaintiffs point to the alleged monopoly held by Urologics as the sole provider of urology services in that market.  It is this monopoly power over the provision of urology services that was allegedly created by the exclusive dealing agreement between Triple-S and Urologics. Accordingly, defendants' arguments that identify Triple-S as the relevant holder of monopoly power miss the mark.

- 28 -

## c.

The Medicare Advantage plaintiffs' challenge to the exclusive dealing agreement alleged to exist between MSO and Urologics fares less well. As the reader may recall, the Medicare Advantage plaintiffs define the market in which they compete as limited to Medicare Advantage patients in one area of Puerto Rico (Western Puerto Rico). Their amended complaint, though, does not allege that MSO controls a substantial portion of that market. Rather, plaintiffs point only to MSO's alleged control of physician contracts with MMM, which plaintiffs in turn describe as "one of the largest Medicare Advantage providers in Puerto Rico." This misalignment between the relevant market as defined in the amended complaint and the allegations of MMM's size in a much wider market eschewed by the amended complaint leaves the amended complaint well short of alleging at least some facts making it plausible that plaintiffs will present a "showing of foreclosure of substantial dimensions" that is "the essential basis . . . for an attack on an exclusivity clause." U.S. Healthcare, Inc., 986 F.2d at 596-597; see Am. Express, 138 S. Ct. at 2284 (plaintiffs must demonstrate that defendant's decision to exclusively purchase from one provider could possibly have "a substantial anticompetitive effect that harms consumers in the relevant market"). Simply put, the amended complaint does not allege facts plausibly pointing to

any substantial degree of foreclosure of the alleged market.[6]  As such, it fails to allege a violation of either sections 1 or 2 of the Sherman Act.  See, e.g., E. Food Servs, 357 F.3d at 8-9.

## IV.

We therefore reverse the district court's order dismissing plaintiffs' federal antitrust claims concerning the arrangement between Triple-S and Urologics, and affirm the district court's order dismissing plaintiffs' federal antitrust claims concerning the arrangement between MSO and Urologics. Because we find that the federal claims of the plaintiffs who challenge the Triple-S/Urologics arrangement were improperly dismissed, we also vacate the district court's decision to decline to exercise supplemental jurisdiction over the Commonwealth law claims of those plaintiffs.  The parties will bear their own costs.

---

[6] Even as to this different, wider market, plaintiffs' allegation is the equivalent of saying that there are an uncertain number of potential purchasers in the market, with some unknown number being among the largest, and MMM is just one of those.